## ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11-1189 (and consolidated cases)

Solvay USA Inc.,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondent.

Petition for Review of Final Administrative Actions of the
United States Environmental Protection Agency

## PROOF OPENING BRIEF FOR ENVIRONMENTAL PETITIONERS

James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Louisiana Environmental Action Network, Sierra Club, Clean Air Council, Desert Citizens Against Pollution, Montanans Against Toxic Burning, Huron Environmental Activist League, Downwinders at Risk, Partnership for Policy Integrity, and Environmental Integrity Project*

**DATED:      April 28, 2014**

**ORAL ARGUMENT NOT YET SCHEDULED**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| Solvay USA Inc., ) | |
|  *Petitioner*, ) | |
|  v. ) | Case No. 11-1189 |
|  ) | (and consolidated cases) |
| U.S. ENVIRONMENTAL ) | |
| PROTECTION AGENCY, ) | |
|  *Respondent*. ) | |

## ENVIRONMENTAL PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Louisiana Environmental Action Network, Sierra Club, Clean Air Council, Desert Citizens Against Pollution, Montanans Against Toxic Burning, Huron Environmental Activist League, Downwinders At Risk, Partnership for Policy Integrity, and Environmental Integrity Project (collectively, "Environmental Petitioners") hereby certify as follows:

**(A) Parties and Amici**

**(i) Parties, Intervenors, and Amici Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

Petitioners:

11-1189  Solvay USA Inc.

11-1192  American Petroleum Institute

11-1202  American Chemistry Council

11-1214  Council of Industrial Boiler Owners

11-1216  Association of American Railroads

11-1217  Treated Wood Council and Railway Tie Association

11-1220  National Association of Clean Water Agencies

11-1221  Sierra Club, Montanans Against Toxic Burning, Huron
         Environmental Activist League, and Downwinders At Risk

11-1223  American Forest & Paper Association, American Wood Council,
         Biomass Power Association, Construction Materials Recycling
         Association Issues and Education Fund, Hardwood Plywood &
         Veneer Association, and National Association of Manufacturers

11-1224  Utility Solid Waste Activities Group, Edison Electric Institute,
         National Rural Electric Cooperative Association, and American
         Gas Association

11-1226  Cement Kiln Recycling Coalition

11-1227  LaFarge North America, Inc.

11-1228  Portland Cement Association

11-1232  Composite Panel Association

11-1233  CEMEX, Inc.

11-1235  Hatfield Township Municipal Authority

11-1238  Rubber Manufacturers Association

13-1152  National Association of Clean Water Agencies

13-1156  Portland Cement Association

13-1157  Cement Kiln Recycling Coalition

13-1158  American Forest & Paper Association, American Wood Council, Biomass Power Association, and National Association of Manufacturers

13-1159  Treated Wood Council

13-1160  CEMEX, Inc. and CEMEX Construction Materials Florida

13-1162  Louisiana Environmental Action Network, Sierra Club, Clean Air Council, Desert Citizens Against Pollution, Montanans Against Toxic Burning, Huron Environmental Activist League, Downwinders At Risk, Partnership for Policy Integrity, and Environmental Integrity Project

13-1164  American Chemistry Council and American Petroleum Institute

13-1165  Holcim (US) Inc.


Respondents:

The respondent in all cases is the United States Environmental Protection Agency. Also named as a respondent in case nos. 11-1216, 11-1220, 11-1221, 11, 1226, 11-1228, 11-1235, 11-1238, 13-1152, 13-1156, 13-1157, 13-1162, and 13-1164 is Regina McCarthy,[1] in her official capacity as Administrator of the U.S. Environmental Protection Agency. The United States of America is also named as a respondent in case no. 11-1238.

---

[1] Regina McCarthy is automatically substituted for Lisa Perez Jackson, who resigned, and Robert Perciasepe. Fed. R. App. P. 43(c)(2).

Intervenors:

Metal Industries Recycling Coalition and Rubber Manufacturers Association have intervened on behalf of petitioner in these consolidated cases.

American Gas Association, Coalition for Responsible Waste Incineration, Edison Electric Institute, National Rural Electric Cooperative Association, Utility Solid Waste Activities Group, ARIPPA, American Forest & Paper Association, American Home Furnishings Alliance, Inc., American Petroleum Institute, American Wood Council, Biomass Power Association, Cement Kiln Recycling Coalition, Construction Materials Recycling Association Issues and Education Fund, Council of Industrial Boiler Owners, Downwinders At Risk, Hardwood Plywood & Veneer Association, Huron Environmental Activist League, LaFarge Building Materials, Inc., LaFarge Midwest Inc., LaFarge North America, Inc., Montanans Against Toxic Burning, National Association of Manufacturers, Portland Cement Association, Rubber Manufacturers Association, Sierra Club, American Chemistry Council, Brayton Point Holdings, Clean Air Council, Desert Citizens Against Pollution, Brayton Point Energy, Environmental Integrity Project, JELD-WEN, Inc., Louisiana Environmental Action Network, Partnership for Policy Integrity, Steel Manufacturers Association, Treated Wood Council, WM Organic Growth, Inc., and WM Renewable Energy have intervened on behalf of respondent in these consolidated cases.

4

**(iii)** *Amici* **in This Case**

There are currently no *amici*.

**(iv) Circuit Rule 26.1 Disclosures for Environmental Petitioners**

See disclosure form filed below.

**(B) Rulings Under Review**

Environmental Petitioners seek review of final actions taken by EPA under the Resource Conservation and Recovery Act at 76 Fed. Reg. 15,456 (Mar. 21, 2011), titled "Identification of Non-Hazardous Secondary Materials That Are Solid Waste," and 78 Fed. Reg. 9112 (Feb. 7, 2013), titled "Commercial and Industrial Solid Waste Incineration Units: Reconsideration and Final Amendments; Non-Hazardous Secondary Materials That Are Solid Waste."

**(C) Related Cases**

Apart from the consolidated cases, Environmental Petitioners are unaware of currently pending related cases. The Court has ordered these cases be heard by the same panel as will hear the following currently pending challenges in this Court to rules related to the rules challenged herein:

*U.S. Sugar Corporation v. EPA*, No. 11-1108 (and consolidated cases)

*American Forest & Paper Association v. EPA*, No. 11-1125 (and consolidated cases)

*American Chemistry Council v. EPA*, No. 11-1141 (and consolidated cases)

DATED:    April 28, 2014                Respectfully submitted,

                                        /s/James S. Pew
                                        James S. Pew
                                        Seth L. Johnson
                                        Earthjustice
                                        1625 Massachusetts Ave., NW
                                        Suite 702
                                        Washington, D.C. 20036-2212
                                        (202) 667-4500
                                        jpew@earthjustice.org
                                        sjohnson@earthjustice.org

                                        *Counsel for Environmental Petitioners*

## ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Solvay USA Inc., <br>              *Petitioner*, <br><br>    v. <br><br> U.S. ENVIRONMENTAL <br> PROTECTION AGENCY, <br>           *Respondent*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. 11-1189
(and consolidated cases)

## ENVIRONMENTAL PETITIONERS' RULE 26.1 DISCLOSURE STATEMENT

### Louisiana Environmental Action Network

<u>Non-Governmental Corporate Party to this Action</u>: Louisiana Environmental Action Network ("LEAN").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: LEAN is a corporation organized and existing under the laws of the State of Louisiana. LEAN is a nonprofit organization which works with citizens' groups throughout the state of Louisiana to develop, implement, protect, and enforce legislative and regulatory environmental safeguards.

### Sierra Club

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

## Clean Air Council

Non-Governmental Corporate Party to this Action: Clean Air Council ("CAC").

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: CAC is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. CAC is a not-for-profit organization focused on protection of public health and the environment.

## Desert Citizens Against Pollution

Non-Governmental Corporate Party to this Action: Desert Citizens Against Pollution.

Parent Corporations: None.

Publicly Held Company that Owns 10% or More of Party's Stock: None.

Party's General Nature and Purpose: Desert Citizens Against Pollution is a corporation organized and existing under the laws of the State of California to protect the communities of the desert from pollution and its threat to human health and the environment.

**Montanans Against Toxic Burning**

<u>Non-Governmental Corporate Party to this Action</u>: Montanans Against Toxic Burning.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Montanans Against Toxic Burning, a corporation registered and existing under the laws of the State of Montana, is a nonprofit, grassroots citizens' advocacy group of health professionals, small business owners, farmers, ranchers, builders, and other concerned citizens focused on air quality issues in Montana. Their goal is to educate the public about the human health and environmental risks of toxic waste incineration. They oppose the burning of hazardous, toxic, and solid wastes in industrial facilities not specifically designed for that purpose. They support the responsible disposal of wastes, including true recycling and other alternatives, and the reduction of hazardous air pollutants through the use of best available control technology.

**Huron Environmental Activist League**

<u>Non-Governmental Corporate Party to this Action</u>: Huron Environmental Activist League.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Huron Environmental Activist League, certified and existing as a non-profit educational corporation under the laws of the State of Michigan, was formed by the residents of Alpena County to educate and protect residents of Alpena County (and other counties as dictated by the Board of Directors) from human and environmental contaminants and their impact on the environment and public health and safety; to work with environmental organizations, regulatory agencies, corporations, and lawmakers in seeking solutions and alternatives to human and environmental contamination; and to monitor the activities of companies that generate human and environmental contaminants in Alpena, Michigan (and elsewhere as dictated by the Board of Directors), as well as the regulatory agencies that oversee such companies.

## Downwinders at Risk

<u>Non-Governmental Corporate Party to this Action</u>: Downwinders at Risk.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Downwinders at Risk, a nonprofit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens' group dedicated to reducing toxic industrial air pollution in North Texas and to continued education and advocacy concerning cement plant pollution.

4

## Partnership for Policy Integrity

<u>Non-Governmental Corporate Party to this Action</u>: Partnership for Policy Integrity ("PFPI").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: PFPI, a corporation organized and existing under the laws of the Commonwealth of Massachusetts, is a nonprofit organization that uses science, policy analysis, and strategic communications to promote sound energy policy.

## Environmental Integrity Project

<u>Non-Governmental Corporate Party to this Action</u>: Environmental Integrity Project ("EIP").

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: EIP, a corporation organized and existing under the laws of the District of Columbia, is a national nonprofit organization that advocates for more effective enforcement of environmental laws.

DATED:      April 28, 2014                  Respectfully submitted,

                                            /s/James S. Pew
                                            James S. Pew
                                            Seth L. Johnson
                                            Earthjustice
                                            1625 Massachusetts Ave., NW
                                            Suite 702
                                            Washington, D.C. 20036-2212
                                            (202) 667-4500
                                            jpew@earthjustice.org
                                            sjohnson@earthjustice.org

                                            *Counsel for Environmental Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ........................... x

PRELIMINARY STATEMENT .................................................................. 1

JURISDICTIONAL STATEMENT ............................................................. 1

STATUTES AND REGULATIONS ........................................................... 2

STATEMENT OF ISSUES ....................................................................... 2

STATEMENT OF THE CASE .................................................................. 3

    I.  CONGRESS'S COMPREHENSIVE FRAMEWORK FOR REGULATING SOLID WASTE. ....................................................................... 3

    II.  THE WASTES AT ISSUE. ................................................................ 7

    III. EPA'S EFFORTS TO EXEMPT CERTAIN BURNING FROM CONGRESS'S FRAMEWORK. ...................................................... 12

    IV. PRACTICAL EFFECTS OF EPA'S EXCLUSIONS. ................................ 19

SUMMARY OF ARGUMENT ................................................................. 22

STANDING ........................................................................................... 24

STANDARD OF REVIEW ..................................................................... 25

ARGUMENT .......................................................................................... 26

    I.  EPA'S RULE IS INCONSISTENT WITH RCRA AND THE CLEAN AIR ACT. ...................................................................................... 26

        A.  EPA's Rule Is Inconsistent with RCRA. ................................. 27

            1.  EPA Unlawfully Deemed Discarded Materials Not to Be Discarded. ................................................................. 27

            2.  Once Discarded, a Secondary Material Cannot Be Processed into A Non-Waste Fuel Under RCRA. .................................... 32

        B.  EPA's Rule Contravenes the Clean Air Act and Defeat's Congress's Purpose in Linking RCRA with the Clean Air Act. .................. 36

    II.  EPA'S RULE IS AN UNREASONABLE INTERPRETATION OF RCRA AND THE CLEAN AIR ACT AND IS ARBITRARY. ..................... 43

CONCLUSION AND RELIEF REQUESTED ....................................... 51

CERTIFICATE REGARDING WORD LIMITATION .........................................53

CERTIFICATE OF SERVICE

DECLARATIONS

STATUTES AND REGULATIONS.............................................Separately Bound

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                    PAGE(S)

*American Bus Association v. Slater*,
    231 F.3d 1 (D.C. Cir. 2000) .................................................................39

\*American Mining Congress v. EPA*,
    824 F.2d 1177 (D.C. Cir. 1987) (*AMC I*) ............... 3, 4, 6, 28, 29, 31, 33, 39, 47

*American Mining Congress v. EPA*,
    907 F.2d 1179 (D.C. Cir. 1990) (*AMC II*) ......................................................6, 28

*American Petroleum Institute v. EPA*,
    906 F.2d 729 (D.C. Cir. 1990) (*API I*) ...........................................................6, 33

*American Petroleum Institute v. EPA*,
    216 F. 3d 50 (D.C. Cir. 2000) (*API II*) ...............................................................6

\*Association of Battery Recyclers v. EPA*,
    208 F.3d 1047 (D.C. Cir. 2000) (*ABR*)............................. 6, 9, 28, 29, 31, 33, 34

*Bluewater Network v. EPA*,
    370 F.3d 1 (D.C. Cir. 2004) .................................................................35

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ...........................................................................27

\*Business Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011) ......................................................44, 45, 48, 49

*Can-Am Plumbing v. NLRB*,
    321 F.3d 145 (D.C. Cir. 2003) .........................................................42

*Chemical Manufacturers Association v. EPA*,
    673 F.2d 507 (D.C. Cir. 1982) ..........................................................4

*Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984).....................................................................25, 36

\* Authorities upon which we chiefly rely are marked with an asterisk

*City of Roseville v. Norton*,
    348 F.3d 1020 (D.C. Cir. 2003) ........................................................................38

*Clark v. Martinez*,
    543 U.S. 371 (2005) ...................................................................................39, 40

*FDA v. Brown & Williamson Tobacco*,
    529 U.S. 120 (2000) ........................................................................................42

*Fox v. Clinton*,
    684 F.3d 67 (D.C. Cir. 2012) ..........................................................................47

*General Instrument Corporation v. FCC*,
    213 F.3d 724 (D.C. Cir. 2000) ........................................................................43

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ........................................................................................32

*Hamilton v. Lanning*,
    560 U.S. 505 (2010) ........................................................................................35

*Hays v. Sebelius*,
    589 F.3d 1279 (D.C. Cir. 2009) ......................................................................42

*Holmes Group v. Vornado Air Circulation Systems*,
    535 U.S. 826 (2002) ........................................................................................39

*In re Espy*,
    80 F.3d 501 (D.C. Cir. 1996) ..........................................................................35

*Int'l Alliance v. NLRB*,
    334 F.3d 27 (D.C. Cir. 2003) ..........................................................................45

*Massachusetts v. DOT*,
    93 F.3d 890 (D.C. Cir. 1996) ..........................................................................25

*Mehrig v. KFC Western, Inc.*,
    516 U.S. 479 (1996) ..........................................................................................3

*Military Toxics Project v. EPA*,
    146 F.3d 948 (D.C. Cir. 1998) ..........................................................................3

*Morton v. Mancari*,
  417 U.S. 535 (1974)..................................................................27

\**Motor Vehicle Manufacturers Association. v. State Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983)............................................ 25, 45, 46, 48, 49, 50

*National Association of Clean Water Agencies v. EPA*,
  734 F.3d 1115 (D.C. Cir. 2013)................................................19

*Natural Resources Defense Council v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007)...............................13, 19, 21, 26, 41

*Natural Resources Defense Council v. EPA*,
  No. 10-1371 (D.C. Cir. Apr. 18, 2014)......................................24

*NetCoalition v. SEC*,
  615 F.3d 525 (D.C. Cir. 2010)..................................................51

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005)......................................................51

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir. 2008)..................................................35

*NSTAR Electric and Gas Corporation v. FERC*,
  481 F.3d 794 (D.C. Cir. 2007)..................................................51

*Owen Elec. Steel Co. of S.C. v. Browner*,
  37 F.3d 146 (4th Cir. 1994) .....................................................29

*Rettig v. Pension Benefit Guaranty Corporation*,
  744 F.2d 133 (D.C. Cir. 1984).................................44, 45, 48, 49

*Roberts v. Sea-Land Services*,
  132 S. Ct. 1350 (2012)............................................................42

*Shays v. FEC*,
  528 F.3d 914 (D.C. Cir. 2008)..................................................38

*Southern S.S. Company v. NLRB*,
  316 U.S. 31 (1942)......................................................27, 38, 42

*Transactive Corporation v. United States,
  91 F.3d 232 (D.C. Cir. 1996) ................................................................26, 46, 49

TRW Inc. v. Andrews,
  534 U.S. 19 (2001) ...........................................................................................37

United States v. ILCO,
  996 F.2d 1126 (11th Cir. 1993) ................................................................6, 29, 31

U.S. Telecom Association v. FCC,
  359 F.3d 554 (D.C. Cir. 2004) .........................................................................51

Village of Barrington v. Surface Transportation Board,
  636 F.3d 650 (D.C. Cir. 2011) .........................................................................25

W. Va. University Hospitals v. Casey,
  499 U.S. 83 (1991) ...........................................................................................38

**STATUTES**

5 U.S.C. §706(2)(A) ................................................................................................25

42 U.S.C. §6901(c) ................................................................................................35

42 U.S.C. §6901(d) ................................................................................................35

42 U.S.C. §6903 ......................................................................................................1

42 U.S.C. §6903(3) .............................................................................................4, 47

42 U.S.C. §6903(5) ..................................................................................................3

42 U.S.C. §6903(14) ..............................................................................................32

42 U.S.C. §6903(19) ..............................................................................................35

42 U.S.C. §6903(20) ..............................................................................................35

42 U.S.C. §6903(22) ..............................................................................................35

*42 U.S.C. §6903(27) ...............................................................3, 27, 32, 38, 47

42 U.S.C. §6905(b)(1)..............................................................................4, 26, 39, 42

42 U.S.C. §6912(a)(1) ............................................................................................1

42 U.S.C. §6941a ..................................................................................................35

42 U.S.C. §6942 .....................................................................................................4

42 U.S.C. §6943 .....................................................................................................4

42 U.S.C. §6944 .....................................................................................................4

42 U.S.C. §6944(b) ...............................................................................................32

42 U.S.C. §6945 .....................................................................................................4

42 U.S.C. §6945(a) ...............................................................................................32

42 U.S.C. §6946 .....................................................................................................4

42 U.S.C. §6947 .....................................................................................................4

42 U.S.C. §6948 .....................................................................................................4

42 U.S.C. §6949 .....................................................................................................4

42 U.S.C. §6949a ...................................................................................................4

42 U.S.C. §6976(a) ...............................................................................................25

42 U.S.C. §6982(c) ...............................................................................................36

42 U.S.C. §7412(a)(1) ..........................................................................................19

42 U.S.C. §7412(a)(2) ..........................................................................................19

42 U.S.C. §7412(d)(5) ..........................................................................................20

42 U.S.C. §7429(a) ...............................................................................................20

42 U.S.C. §7429(a)(1)(A) .....................................................................................41

42 U.S.C. §7429(a)(1)(B) .....................................................................................41

42 U.S.C. §7429(a)(1)(D) .....................................................................................19

42 U.S.C. §7429(a)(2) ............................................................................................5

42 U.S.C. §7429(c) ................................................................5

42 U.S.C. §7429(d) ................................................................5

42 U.S.C. §7429(e) ................................................................5

42 U.S.C. §7429(g)(1) ........................................................5, 26

* 42 U.S.C. §7429(g)(1)(B) ..............................................37, 38

* 42 U.S.C. §7429(g)(6) ..........................................4, 6, 26, 39

42 U.S.C. §7661a(a) ..............................................................20


**REGULATIONS**

40 C.F.R. §63.1343 ..............................................................21

40 C.F.R. §241.2 ........................................................28, 30, 51

40 C.F.R. §241.3 ................................................................28

40 C.F.R. §241.3(b)(4) ....................................................32, 51

40 C.F.R. §241.4 ............................................................28, 41

40 C.F.R. §241.4(a)(1) ..........................................................52

40 C.F.R. §258.2 ................................................................13

40 C.F.R. §261.1(b)(1) ......................................................4, 40

40 C.F.R. §261.2 ............................................................4, 13

40 C.F.R. §261.2(c)(2) ..........................................................40

40 C.F.R. §279 ..................................................................47

40 C.F.R. §279.1 ..................................................................9

**FEDERAL REGISTER NOTICES**

65 Fed. Reg. 75,338 (2000) ....................................................12

74 Fed. Reg. 41 (Jan. 2, 2009) ...................................................4, 13, 14

74 Fed. Reg. 51,368 (Oct. 6, 2009).........................................................41

75 Fed. Reg. 31,844 (June 4, 2010) .........................................14, 19, 20

76 Fed. Reg. 15,456 (Mar. 21, 2011)................................... 1, 12, 14-17, 19, 20, 27, 30, 33, 34, 36, 40, 41, 43-50

76 Fed. Reg. 80,452 (Dec. 23, 2011) ......................................... 14, 19, 20

78 Fed. Reg. 9112 (Feb. 7, 2013) ..........................1, 7, 10, 14-17, 21, 32, 33, 48-50

## <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| AMC | American Mining Congress |
| API | American Petroleum Institute |
| EPA | Respondents U.S. Environmental Protection Agency and Gina McCarthy, Administrator |
| NRDC | Natural Resources Defense Council |
| RCRA | Resource Conservation and Recovery Act |

## PRELIMINARY STATEMENT

This case challenges EPA's effort to deem various solid wastes to be non-wastes, so that facilities which choose to burn them do not have to control, monitor, or report the resulting emissions. The newly excluded "non-wastes" include materials that produce especially toxic pollution when they are burned: whole tires, construction and demolition debris, debris from paper mills, and used oil, to name just a few.

## JURISDICTIONAL STATEMENT

**(A) Agency.** Respondents U.S. Environmental Protection Agency and Gina McCarthy, Administrator (collectively, "EPA" or "the agency") have jurisdiction to issue rules implementing the Resource Conservation and Recovery Act ("RCRA"). RCRA §§1004, 2002(a)(1), 42 U.S.C. §§6903, 6912(a)(1).

**(B) Court of Appeals.** Under 42 U.S.C. §6976(a)(1), this Court has jurisdiction to review the final EPA actions, taken at 76 Fed. Reg. 15,456 (Mar. 21, 2011), JA____, and 78 Fed. Reg. 9112 (Feb. 7, 2013), JA____, challenged here.

**(C) Timeliness.** The petitions for review were timely filed within the 90-day window of RCRA §7006(a)(1), 42 U.S.C. §6976(a)(1), on June 16, 2011 (No. 11-1221), and May 8, 2013 (No. 13-1162).

1

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES

Though RCRA and the Clean Air Act make "discard" the sole criterion for determining if a material is solid waste, not whether the material is burned as fuel, EPA defined solid waste to exclude materials like scrap tires and "clean" construction and demolition wood when those materials are burned as fuel. EPA's definition also allows discarded material to be burned without being considered solid waste if it was "sufficiently processed" and satisfies certain conditions.

1.    Does EPA's definition violate RCRA by

    a.    Excluding materials that are discarded?

    b.    Excluding discarded materials that have been processed?

2.    Does EPA's definition violate the Clean Air Act and frustrate Congress's purpose in linking RCRA and the Clean Air Act into a comprehensive regulatory scheme?

3.    Is EPA's definition an unreasonable interpretation of RCRA and the Clean Air Act and arbitrary?

2

## STATEMENT OF THE CASE

## I.   CONGRESS'S COMPREHENSIVE FRAMEWORK FOR REGULATING SOLID WASTE.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996); *accord, e.g.*, *Military Toxics Project v. EPA*, 146 F.3d 948, 950 (D.C. Cir. 1998) ("RCRA establishes a comprehensive program to regulate the handling of "'solid waste[.]'"). It gives EPA authority to regulate solid waste. *Am. Mining Cong. ("AMC") v. EPA*, 824 F.2d 1177, 1178 (D.C. Cir. 1987) ("*AMC I*"). Key to this case, Congress defined "solid waste" in RCRA §1004(27) to mean "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities," with certain exceptions not relevant here. 42 U.S.C. §6903(27) (emphasis added). Thus, by definition, if a material is "discarded," it is solid waste. Solid waste is "hazardous waste" if it has certain characteristics. *Id.*

3

§6903(5); *e.g.*, *AMC I*, 824 F.2d at 1179. Only non-hazardous solid waste is at issue in this case.[1]

Congress addressed solid waste management and landfilling within RCRA,[2] 42 U.S.C. §§6942-6949a (requiring EPA to work with states on solid waste management plans and to establish standards for municipal landfills, and banning open dumping), and addressed solid waste burning under the Clean Air Act. RCRA directs EPA to integrate RCRA and the Clean Air Act "to the maximum extent practicable," giving effect to the goals and policies of each statute. *Id.* §6905(b)(1). The Clean Air Act directs EPA to set emission standards for facilities that burn solid waste and provides that "[s]olid waste" has "the meaning[] established by the Administrator pursuant to the Solid Waste Disposal Act."[3] *Id.* §7429(g)(6).

The Clean Air Act's incinerator provision, §129, requires EPA to set stringent, numerical air emissions standards for particulate matter, sulfur dioxide,

---

[1] Unless expressly noted, the term "solid waste" herein refers only to non-hazardous solid waste. EPA has another regulatory definition of "solid waste" that it says applies only for regulations addressing RCRA's hazardous waste provisions. 40 C.F.R. §§261.1(b)(1), 261.2.

[2] RCRA defines "disposal" to cover land and water dumping of solid waste; the definition does not address burning it. 42 U.S.C. §6903(3).

[3] RCRA was a major revision of the Solid Waste Disposal Act, and is commonly used to refer to it. *Chem. Mfrs. Ass'n v. EPA*, 673 F.2d 507, 509 & n.3 (D.C. Cir. 1982); 74 Fed. Reg. 41, 43/2 n.1 (Jan. 2, 2009).

hydrogen chloride, oxides of nitrogen, carbon monoxide, lead, cadmium, mercury, and dioxins emitted from solid waste incineration units. 42 U.S.C. §7429(a). Section 129 standards must cover existing and new incinerators, and must require "the maximum degree of reduction in emissions" that is "achievable," considering various factors, including cost. *Id.* §7429(a)(2). Regardless of cost or the other statutory factors, Congress mandated that what would be deemed "achievable" must be at least as stringent as the results "achieved in practice" by the best performing sources (the single best performer for new and modified units; the average of the best-performing 12% for existing units). *Id.* In addition, incinerator operators must undergo training, incinerators are subject to monitoring requirements, and incinerators must obtain federal Title V operating permits. *Id.* §7429(c)-(e).

Section 129 applies to all "solid waste incineration unit[s]." These are any "distinct operating unit of any facility which combusts any solid waste material from commercial or industrial establishments or the general public," except for units burning hazardous waste; metals recovery facilities; certain power production and cogeneration facilities that "burn homogeneous waste (such as units which burn tires or used oil, but not including refuse-derived fuel)"; and "air curtain incinerators" that "only burn wood wastes, yard wastes and clean lumber." *Id.* §7429(g)(1). As noted above, §129(g)(6) defines "solid waste" to have the

5

meaning established by EPA under RCRA. *Id.* §7429(g)(6). Thus, EPA's definition of "solid waste" under RCRA is integral to how it regulates combustors under the Clean Air Act, and that definition of solid waste hinges on the term "discarded."

This Court has held and reiterated that in RCRA §1004(27), "discarded" unambiguously has its ordinary, everyday meaning of "disposed of, abandoned, or thrown away." *AMC I*, 824 F.2d at 1193; *accord Am. Petroleum Inst. ("API") v. EPA*, 216 F.3d 50, 55-56 (D.C. Cir. 2000) ("*API II*"); *Ass'n of Battery Recyclers v. EPA*, 208 F.3d 1047, 1055-56 (D.C. Cir. 2000) ("*ABR*"). Once a material is discarded, it and any material derived from it remain solid waste "even if it might be reclaimed and reused at some future time." *ABR*, 208 F.3d at 1056; *accord United States v. ILCO*, 996 F.2d 1126, 1132 (11th Cir. 1993) ("Previously discarded solid waste, although it may at some point be recycled, nonetheless remains solid waste.");[4] *API I*, 906 F.2d at 741 (once material is discarded, "it has 'become part of the waste disposal problem'" and is subject to RCRA) (quoting *AMC I*, 824 F.2d at 1186; emphasis in original).

---

[4] The 11th Circuit relied on this Circuit's caselaw for this point, citing *AMC v. EPA*, 907 F.2d 1179, 1186-87 (D.C. Cir. 1990) ("*AMC II*"); *API v. EPA*, 906 F.2d 729, 741 (D.C. Cir. 1990) ("*API I*"); and *AMC I*, 824 F.2d at 1187 n.14. Moreover, this Court cited the 11th Circuit's language approvingly in *API II*, 216 F.3d at 56.

## II.    THE WASTES AT ISSUE.

**Scrap tires** are tires that cannot be used anymore as tires or are somehow defective so that they cannot be used on vehicles. EPA-HQ-RCRA-2008-0329-1822 at 1, JA____. When passenger vehicle and light-duty truck tires wear out, or the vehicles themselves no longer work, their owners discard them. *Id.*, JA____. Similarly, tire manufacturers discard "off-specification" tires and factory scraps. 78 Fed. Reg. 9154/2-3, JA____. Most of these tires and tire scraps eventually get shipped to processers who may shred them and remove metal from them to make tire-derived fuel. EPA-HQ-RCRA-2008-0329-1822 at 9-10, JA____-__. Historically, tires have also been dumped in tire piles, and these long-discarded tires can also find their way to processers. *Id.* 8-9, JA____-__.

Many scrap tires are burned, with the percent increasing to about 50%. *Id.* 7 & ex.6, JA____. Some industries, like the cement industry, usually burn them whole. *Id.* 4-5, JA____-__. Others, like pulp and paper manufacturers and industrial boilers, burn them after they have been shredded and sometimes have wires removed. *Id.* 10, JA____. Though plants pay for shredded tires, cement plants that take whole tires almost always get paid to take them, with a few taking them for free. *Id.* 14, JA____. "No kilns pay for whole tires." EPA-HQ-RCRA-2008-0329-0507 at 1, JA____.

7

Scrap tires contain cadmium, sulfur, lead, and fluoride. EPA-HQ-RCRA-2008-0329-1822 at 13 ex.9, JA____. They also contain chlorine-containing compounds, which can result in formation of pollutants like dioxins during combustion. EPA-HQ-RCRA-2008-0329-0444 (attached amici brief) 9-10, JA____-__. Studies of the impacts of burning tires are limited, showing emissions of some pollutants increase and others decrease, though not all pollutants are measured. EPA-HQ-RCRA-2008-0329-1822 at 15-17 & ex.11, JA____-__. Further, though EPA says that "well-designed, well-operated and well-maintained" plants can have emissions levels of some pollutants when burning tires that are comparable to emissions levels without tires, it warns that "little data exists for" plants that "are not well-designed," and suggests caution before such plants burn tires. *Id.* 16, JA____. Indeed, experience shows that burning scrap tires can lead to increases in emissions of pollutants like dioxins, cadmium, and lead, as well as particulate matter and mercury. EPA-HQ-RCRA-2008-0329-0004 at 3, JA____; EPA-HQ-RCRA-2008-0329-0444 at 2, 7, JA____, ____; *see also id.* 7 (explaining why badly combusted tires burn so poorly and emit carcinogens), JA____.

Scrap tires can be reused in a variety of ways. For example, they can be retreaded and returned to use. epa.gov/solidwaste/conserve/materials/tires/markets.htm#reuse (last updated Sept. 13, 2013), JA____. They can also be used in civil engineering, for example, as fill

in construction, and they can be used as ground rubber in asphalt or in rubber products, including new tires. EPA-HQ-RCRA-2008-0329-1822 at 8, JA____; epa.gov/solidwaste/conserve/materials/tires/ground.htm (last updated Aug. 2, 2013), JA____; epa.gov/solidwaste/conserve/materials/tires/civil_eng.htm (last updated Nov. 14, 2013), JA____.

**Used oil** is oil that is refined from crude oil or a synthetic oil and that has been used, for example, as motor oil, heat transfer fluid, or hydraulic fluid; as a result of its use, it is contaminated by physical or chemical impurities. EPA-HQ-RCRA-2008-0329-1827 at 1, JA____; *see also* 40 C.F.R. §279.1 (defining used oil). Used motor oil contains lead, cadmium, arsenic, and sulfur. EPA-HQ-RCRA-2008-0329-1827 at 7-8, 10 ex.7, JA____-__, ____. Other additives found in used oil include phenols, chlorinated waxes, and organic compounds. *Id.* 8 ex.5, JA____. If a used oil's contaminant concentrations are lower than certain EPA-established criteria, the agency deems it "on-spec"; if higher, it is "off-spec." *Id.* 3, JA____. Under EPA's criteria, between 0.7-4% is off-spec. *Id.* 4, JA____.

After an oil becomes contaminated and the original user gets rid of it, that oil is "typically collect[ed]…, distill[ed], and [sold] for use as fuel in boilers." *ABR*, 208 F.3d at 1054-55; *accord* EPA-HQ-RCRA-2008-0329-1827 at 6, JA____. Thus, a significant amount of used oil (70-90%) is burned, particularly in boilers. EPA-HQ-RCRA-2008-0329-1827 at 2, 5, JA____, ____. Burning used oil can

9

result in increased emissions of particulate matter and lead. *Id.* 11, JA____. EPA acknowledges that "other uses for used oil may be environmentally preferable." *Id.*, JA____. Used oil can be re-refined into lubricating oil or for use in phosphate benefication. *Id.* 2, 5, JA____, ____.

"**Clean cellulosic biomass**" is an EPA-invented category that includes waste woods from several sources. 78 Fed. Reg. 9211/2-12/1 (codified at 40 C.F.R. §241.2), JA____-__. One is **wood from construction and demolition debris**, which comes from building and dismantling buildings.[5] EPA-HQ-RCRA-2008-0329-1811 at 1, JA____. Construction yields scrap or excess materials, including wallboard, plastic, metal, insulation, and wood, that must be disposed of. *Id.*, JA____. Demolition debris similarly consists of a variety of materials, and the wood in it "is often painted or chemically treated or is fastened to other materials, making separation difficult." *Id.*, JA____.

Much of this material is burned in boilers. *Id.* 3, JA____. Processors get paid to take the construction and demolition debris. *Id.* 8, JA____. Usually, processors claim to remove non-wood materials, and they may also chip or shred the wood into hog fuel. *Id.* 6, JA____. It is difficult to distinguish "clean" construction and demolition wood from other materials, including contaminated wood. EPA-HQ-

---

[5] EPA also discusses railroad ties and utility poles, EPA-HQ-RCRA-2008-0329-1811 at 1, JA____, but they are not at issue in this brief.

RCRA-2008-0329-1974 ("Comments of Partnership for Policy Integrity") 10-11,

14, JA____-__, ____; EPA-HQ-RCRA-2008-0329-1393, JA____.



**Fig.1**: Boiler fuel made from "forest industry waste, shredded construction wood waste, and demolition debris."[6]

Construction and demolition wood can also be productively reused, for

example, as lumber, for engineered wood, or as mulch. EPA-HQ-RCRA-2008-

0329-1881 at 4, JA____. When reused as lumber, it can fetch 20-32 times the

---

[6] Comments of Partnership for Policy Integrity 11-12 (quoting and using picture from case study), JA____-__.

revenue as selling it for fuel or mulch. *Id.*, JA____. Wood that is recycled for

engineered wood is also worth more than wood sold for fuel or mulch. *Id.*, JA____.

Finally, **pulp and paper residuals** cover wastes from the pulp and paper

manufacturing industry; such wastes include refuse and rejects from pulping and

recycling, kraft pulp fibers, and paper pellets, separate from the sludges from

wastewater treatment at mills. EPA-HQ-RCRA-2008-0329-1809 at 1, 3 n.4,

JA____, ____. These rejects are "paper fiber that is unusable (due to impurities,

fibers too small for recycling process) resulting from the recycling process,"

including old corrugated cardboard rejects, which EPA calls "OCC rejects." EPA-

HQ-RCRA-2008-0329-2007 at 1-2, JA____-__; 76 Fed. Reg. 15,472/1, 15,486/2

JA____, ____. Like wood wastes, pulp and paper wastes are often burned. EPA-

HQ-RCRA-2008-0329-1809 at 3, 5-6, JA____, ____-__.


## III.  EPA'S EFFORTS TO EXEMPT CERTAIN BURNING FROM CONGRESS'S FRAMEWORK.

In 2000, EPA promulgated standards under Clean Air Act §129 for

commercial and industrial solid waste incinerators. 65 Fed. Reg. 75,338 (2000).

Claiming that §129 covered only units that burn solid waste <u>without</u> energy

recovery, EPA defined "commercial and industrial waste" to exclude solid waste

burned for energy recovery and excluded units burning such waste from regulation

under §129. *Id.* 75,342/2-43/2, JA____-__. Sierra Club petitioned for review.

12

*Sierra Club v. EPA*, No. 01-1048 (D.C. Cir. filed Jan. 30, 2001). Among other flaws in the rule, EPA had not proposed any such definitions, so this Court granted an unopposed EPA motion for voluntary remand so it could reconsider the rule. Order, *Sierra Club*, No. 01-1048 (D.C. Cir. Sept. 6, 2001). On reconsideration, EPA reaffirmed it would exempt units that combusted solid waste from regulation under §129 but did so by defining "commercial or industrial solid waste incineration unit" to exclude units that recover energy from the combustion of waste. *See Natural Res. Def. Council ("NRDC") v. EPA*, 489 F.3d 1250, 1256 (D.C. Cir. 2007) (definitions in reconsideration rule were "substantively the same as before reconsideration"). EPA's definitions "substantially reduce[d] the number of commercial or industrial waste combustors subject to section 129's standards by exempting from coverage any commercial or industrial incinerator" recovering energy from solid waste combustion. *Id.* 1258. This Court found that EPA's definitions were contrary to the Clean Air Act's plain language. *Id.* 1257; *see also id.* 1260 (specifically rejecting EPA's attempt to exempt energy recovery units).

The Clean Air Act avenue closed, EPA turned its attention to RCRA's definition. EPA already has a multitude of regulatory definitions of solid waste. *E.g.*, 40 C.F.R. §§258.2, 261.2. It began working on another, requesting comment in 2009 on an approach to "secondary materials"—like post-consumer, post-industrial, and scrap materials, 74 Fed. Reg. 44/1 n.2, JA____—that would

13

determine whether such materials were solid waste "when combusted." *Id.* 53/1-2, JA_____. EPA then proposed, 75 Fed. Reg. 31,844 (June 4, 2010), JA_____, and finalized a new Part in the Code of Federal Regulations, titled "Solid Wastes Used as Fuels or Ingredients in Combustion Units," 76 Fed. Reg. 15,549/3-51/3 (codified as amended at 40 C.F.R. pt.241), JA_____-__. In response to industry concerns, EPA swiftly moved to amend the just-promulgated rule. 76 Fed. Reg. 80,452, 80,469/2-3 (Dec. 23, 2011), JA_____. The agency finalized its amendments to the rule, expanding the categories of materials that EPA deemed not solid wastes when burned and establishing and adjusting processes for exempting more materials from being solid waste. 78 Fed. Reg. 9136/1-38/1, JA_____-__; *id.* 9211/1-13/3 (codified at 40 C.F.R. pt.241), JA_____-__.

14

EPA illustrated, in the following graphic, how its rule focused on determining whether materials are wastes <u>when burned</u>:



**Fig.2**.[7]

EPA established that secondary materials are solid wastes by default, except for materials that are excluded. 78 Fed. Reg. 9212/2 (codified at 40 C.F.R. §241.3(a)), JA____; *see also* 76 Fed. Reg. 15,550/2 (codified at 40 C.F.R. §241.2) (defining "secondary material"), JA____. One exclusion is an EPA-created category of materials it called "traditional fuels." All "traditional" fuels are defined not to be solid wastes, unless discarded. 76 Fed. Reg. 15,459/1, JA____. EPA

---

[7] EPA-HQ-RCRA-2008-0329-0599 slide 17, JA____.

explained it used the word "traditional" not in the sense that ordinary people use it, but "more in the sense that we have a product that is created for its use as a fuel." *Id.* 15,477/1, JA____. Despite that explanation, the "traditional fuels" exclusion covers "alternative" fuels that are not produced for fuel, like used oil and the "clean" wood in demolition debris. *Id.* 15,478/3-79/1, JA____-__; 78 Fed. Reg. 9211/2-3 (codified at 40 C.F.R. §241.2), JA____. "Clean" means the material cannot contain EPA-listed contaminants, a list that relies exclusively on the pollutants listed in Clean Air Act §§112 and 129, "at concentrations not normally associated with virgin biomass materials." 78 Fed. Reg. 9211/3-12/1, JA____-__.

EPA also categorically excluded from waste status materials that include scrap tires collected by tire collection programs, but only "when used as a fuel in a combustion unit." *Id.* 9213/2 (codified at 40 C.F.R. §241.4(a)), JA____. Though acknowledging that "tires are not produced for their fuel value," 76 Fed. Reg. 15,495/3, JA____, EPA claimed that such programs do not "allow for an opportunity for scrap tires intended as a fuel to be discarded in the first place," *id.* 15,534/2, JA____. Under EPA's rule, likely "[f]ar less than 10% of the tires that are used every year for fuel" are waste. EPA-HQ-RCRA-2008-0329-1822 at 11, JA____.

Also, EPA excluded "OCC rejects"—materials from old corrugated cardboard rejected as unrecyclable—when burned at pulp and paper mills. Ignoring

16

that old cardboard is initially thrown out before arriving at a paper mill, it deemed the parts that cannot be recycled "not discarded when used within the control of the generator, such as at pulp and paper mills." 76 Fed. Reg. 15,486/3-87/1, JA____-__.

Finally, EPA allowed materials that were undisputedly discarded to shed that status so long as the facility burning them determines for itself that they are "sufficiently processed" and used as a "legitimate fuel" under EPA's "legitimacy criteria." *Id.* 15,460/1, JA____; *see also id.* 15,550/2-51/3 (codified as amended at 40 C.F.R. §§241.2, 241.3(b)(4), (d)), JA____-__; 78 Fed. Reg. 9213/1-2 (amending 40 C.F.R. §241.3(d)), JA____. This exclusion allows any tire that has been shredded with "a significant portion of the metal…removed," "specific to the combustion unit," to be burned without triggering Clean Air Act §129. 76 Fed. Reg. 15,472/1, 15,498/3-99/1, JA____, ____-__. Similarly, any construction and demolition wood that has been sorted to remove contaminants and then sized is no longer solid waste. *Id.* 15,498/1-2, JA____. Other materials EPA has since indicated are sufficiently processed and legitimate include processed poultry litter, "fuel cubes" made from paper and plastic, and an "engineered fuel" made from municipal solid waste. epa.gov/osw/nonhaz/define/pdfs/wellons_energy_letter.pdf, JA____; epa.gov/epawaste/nonhaz/define/pdfs/roaring-spring-fuel-cubes.pdf, JA____; epa.gov/epawaste/nonhaz/define/pdfs/entsorga_srf_signed.pdf, JA____;

17

*see also* epa.gov/epawaste/nonhaz/define/index.htm#gc (list of EPA

determinations for specific waste processing activities), JA_____.

The following flowchart illustrates, with some simplification, EPA's basic

approach:



**Fig.3**.[8]

## IV.    PRACTICAL EFFECTS OF EPA'S EXCLUSIONS.

The Clean Air Act requires EPA to regulate all facilities that combust any solid waste material, *NRDC*, 489 F.3d at 1258-60, but, despite repeated efforts, EPA has not established lawful standards for units "combusting commercial or industrial waste," 42 U.S.C. §7429(a)(1)(D). Units combusting commercial or industrial waste largely comprise industrial boilers and process heaters that are used to generate power and heat at industrial facilities like refineries, chemical plants, and paper mills. 75 Fed. Reg. 31,845-46, JA____-__. They also include some waste-burning cement plants and other facilities. *Id.*, JA____-__. According to EPA, there are approximately 13,000 industrial boilers operating at "major sources," 78 Fed. Reg. 7138, 7155-56 tbl.5 (Jan. 31, 2013), JA____-__, and almost 200,000 operating at "area sources," 76 Fed. Reg. 15,554, 15,579 tbl.4 (Mar. 21, 2011), JA____. The Clean Air Act defines as "major" any source with the potential to emit at least 10 tons per year of any one listed pollutant or 25 tons per year of any combination of listed pollutants, and defines an "area" source as any source that is not "major." 42 U.S.C. §7412(a)(1)-(2).

For major sources, Clean Air Act §112 requires standards that are similar to those required by §129. Although they apply to different sets of pollutants, their stringency provisions are "virtually identical." *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1119-20 (D.C. Cir. 2013). For area sources,

19

however, §112(d)(5) allows EPA to set less stringent standards that merely "provide for the use of generally available control technologies or management practices." 42 U.S.C. §7412(d)(5). Further, the Clean Air Act allows EPA to exempt area sources from permitting requirements if the agency finds that compliance with permitting requirements is "impracticable, infeasible, or unnecessarily burdensome." *Id.* §7661a(a). Thus, whereas Congress determined that incinerators warrant the Clean Air Act's most protective emission standards, regardless of their size, it allowed EPA to set much less protective standards for non-incinerators operating at sources below the major source threshold. The extent to which a combustion unit's emissions must be controlled depends heavily on whether it burns waste and is therefore an incinerator. *See, e.g.*, 75 Fed. Reg. 31,848/3, JA____.

EPA's emission standards for area source industrial boilers require very little in the way of controls. If they burn oil, their only obligation is to conduct initial and biennial "tune-up." 78 Fed. Reg. 7518 tbl.2, JA____. Likewise, boilers that burn solid fuel need only conduct tune-ups if they burn at least 15% biomass. *Id.*, JA____; 76 Fed. Reg. 15,599/3 (defining "biomass" and "biomass subcategory"), JA____. Thus, under EPA's rules, almost 200,000 area source boilers can burn used oil, tires, and "clean" demolition debris without any limit on their resulting emissions. In addition, these facilities will not have to monitor their emissions or

20

obtain Title V permits. Many large industrial plants are area sources. *See, e.g.*,

EPA-HQ-OAR-2008-0334-0011 at 2 (1700 chemical manufacturing facilities are

area sources), JA____. Further, even boilers and cement plants that are major

sources of hazardous air pollutants will be allowed to emit more of dangerous

pollutants like particulate matter, sulfur dioxide, dioxins, and precursors to ozone

pollution than they would be if those materials were properly considered solid

wastes. *Compare, e.g.*, 78 Fed. Reg. 9118 tbl.2, 9122-23 tbl.4 (waste-burning

cement plants), JA____, ____-__, *with* 40 C.F.R. §63.1343 tbl.1 (non-waste-

burning cement plants).

     As a result of the rule at issue here, the number of commercial and industrial

waste incinerators has been "substantially reduced," just as it was by the definition

of incinerator that this Court rejected in *NRDC*, 489 F.3d at 1258. Of almost

200,000 industrial boilers and cement plants, only about 175 would have been

considered incinerators when EPA proposed the definition, and, after EPA

expanded exclusions from it, now only 106 are. EPA-HQ-RCRA-2008-0329-1260

(Sierra Club Comments on 2010 proposal) 1, JA____;

epa.gov/airquality/combustion/docs/20121221_ciswi_recon_fs.pdf at 2, JA____;

*cf. NRDC*, 489 F.3d at 1261 (noting that EPA's definition shifted thousands of

units from being considered incinerators). The now-exempted facilities will avoid

the stringent standards that Congress intended to govern units that burn solid

waste, even when they burn tires, used oil, scrap wood from construction and demolition debris, the unrecyclable remnants of paper and cardboard sent to be recycled, and materials they themselves deem processed enough and used legitimately. All these materials can contain heavy metals that can be emitted into the air when burned, and can contain other constituents that can lead to the air emission of other pollutants, including dioxins. The pollutants ultimately emitted can cause cancer, liver problems, neurological problems, eye and skin irritation, and a range of harms to the heart and lungs, including heart attacks, asthma attacks, and other respiratory symptoms that can require emergency room visits and hospitalization. EPA-HQ-RCRA-2008-0329-1973 at 6-13, JA____-__.

## SUMMARY OF ARGUMENT

EPA's definition of waste excludes materials that are "discarded" within the ordinary meaning of that term. It also excludes materials that are undisputedly discarded but then "processed" and burned as fuel. These exclusions contravene RCRA, which defines the term "solid waste" to include "any" discarded material, and this Court's precedent, which makes clear that once-discarded materials remain solid waste regardless of whether they are subsequently processed and burned as fuel.

EPA's exclusions also defeat Congress's purpose in linking RCRA and the Clean Air Act with a common definition of solid waste. Rather than promulgating

22

a single definition that would support a coherent statutory scheme, EPA has promulgated a definition for Clean Air Act purposes that conflicts with the definition it uses under RCRA.

Further, this new definition turns primarily on whether or not a material is burned for energy—a distinction that is irrelevant under the Clean Air Act. The Clean Air Act recognizes that the emissions from waste-burning are just as dangerous whether or not the waste is burned for energy; as this Court has already held, the Act's incinerator provisions apply to energy-recovery units and non-energy-recovery units alike. Rather than harmonizing RCRA and the Clean Air Act, EPA reads RCRA in a way that effectively recreates its unlawful exemption for energy-recovery units and defeats Congress's intent to protect the public from the toxic emissions that waste-burning produces. EPA's reading also renders language in the Clean Air Act insignificant, if not superfluous,

Finally, EPA's rationale for the exclusions is riddled with internal contradictions and non-sequiturs. For example, EPA rejected comments urging it to consider the Clean Air Act in developing its definition of solid waste, but relied solely on the Clean Air Act to determine what count as "contaminants" that can render a material discarded under the definition. Elsewhere, the agency claims that because fewer scrap tires are being sent to dumps, fewer tires are being discarded—conveniently ignoring its own assertion that tires are discarded if they

23

are discarded "in the first instance," regardless of whether they are subsequently dumped or burned. EPA's failure to provide a rational and internally consistent basis for the exclusions is unlawful and arbitrary.

## STANDING

Petitioners have members who live, work, and recreate near facilities that burn the materials at issue in this suit. *See* declarations. As a result of the rules at issue here, those facilities are allowed to emit greater quantities of pollutants, like particulate matter, hydrogen chloride, and cadmium, than they otherwise would, and Petitioners' members will suffer harms to their health and welfare interests; a ruling in their favor would "help alleviate" those harms by more effectively limiting those facilities' emissions. *NRDC v. EPA*, No. 10-1371, slip op. 14 (D.C. Cir. Apr. 18, 2014); *see* declarations.

In addition, because the rules at issue allow area sources that affect Petitioners' members to burn solid wastes without getting federal Title V permits addressing the pollutants regulated under §129 (if they have to get any Title V permit at all), they harm Petitioners procedurally by denying them the right to participate in public permitting processes governing facilities' emissions that affect them. *See* declarations. Moreover, the rules harm Petitioners by depriving them of information, including from monitoring, about emissions from such sources that

24

the Clean Air Act's monitoring and permitting provisions would afford them if the materials were solid waste. *Id.*

## STANDARD OF REVIEW

At issue is whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *see also* 42 U.S.C. §6976(a). For matters of statutory interpretation, *Chevron* governs: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). Thus, if the intent of Congress is clear, the agency's interpretation is accorded no deference. *Id.* If the statute is ambiguous, at *Chevron* step two, a reviewing court defers to the agency's interpretation of the statute only if (among other things) "the agency has offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011), and the interpretation does not "diverge[] from any realistic meaning of the statute," *Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996). EPA's action is arbitrary and capricious if it relies on irrelevant factors, fails "to consider an important aspect of the problem," or rests on an explanation that fails to give "a rational connection between the facts found and the choice made," "runs counter to the evidence before the agency," or is wildly "implausible." *Motor Vehicle Mfrs. Ass'n of U.S.*

25

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In particular, "agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

## ARGUMENT

## I.    EPA'S RULE IS INCONSISTENT WITH RCRA AND THE CLEAN AIR ACT.

In comprehensively regulating solid waste, Congress deliberately linked the Clean Air Act's incinerator provisions with RCRA's definition of solid waste. Clean Air Act §129(g) defines an incinerator as "any facility which combusts any solid waste material from commercial or industrial establishments or the general public," with certain narrow and specific exceptions. 42 U.S.C. §7429(g)(1); *see NRDC*, 489 F.3d at 1257-58. It then provides that "the term[] 'solid waste'…shall have the meaning[] established by the Administrator pursuant to [RCRA]." 42 U.S.C. §7429(g)(6). RCRA itself reinforces this express tie, for Congress there required EPA to "integrate" RCRA "with the appropriate provisions of the Clean Air Act," among other statutes, as practicable, and "to the extent that [such integration] can be done in a manner consistent with the goals and policies" in RCRA and the other statutes. *Id.* §6905(b)(1). Thus, the general obligation EPA and this Court have to respect both RCRA and the Clean Air Act, "regard each as

26

effective," and provide a "careful accommodation of one statutory scheme to another" applies here with particular force. *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *Southern S.S. Co. v. NLRB*, 316 U.S. 31, 47 (1942); *see also Boumediene v. Bush*, 553 U.S. 723, 776 (2008) ("When interpreting a statute, we examine related provisions in other parts of the U.S. Code.").

**A.    EPA's Rule Is Inconsistent with RCRA.**

**1.    EPA Unlawfully Deems Discarded Materials Not to Be Discarded.**

EPA's definition of solid waste excludes materials that have been "discarded" within the ordinary meaning of that term. 42 U.S.C. §6903(27). For example, EPA claims that "scrap tires removed from vehicles and managed under the oversight of state and other established tire collection programs are not 'discarded in the first instance.'" 76 Fed. Reg. 15,534/1, JA____. Thus, according to EPA, when the owner of a car determines that her tires are worn out, drives to the tire store, and has her old tires removed and taken away, she has not "discarded" her old tires. *Id.*, JA____. Similarly, when she decides that her engine oil needs to be replaced, drives to a service station, and has her old oil drained and replaced, she has not "discarded" the old oil. *Id.* 15,502/2, JA____. If the owner of a building decides to knock her building down and have the debris hauled away, she has not "discarded" all the wood in that debris, only the wood that, in EPA's view, is not "clean." *Id.* 15,485/2, JA____.

27

EPA categorically excludes all these materials, and others, from the definition of solid waste. 40 C.F.R. §§241.2-241.4. But, as this Court already has held, the term "discarded" in RCRA's definition of solid waste unambiguously has its ordinary plain meaning of "disposed of, abandoned, or thrown away." *AMC I*, 824 F.2d at 1193. When a car owner gets rid of her old, worn-out tires and leaves them at the tire store, she has disposed of them, abandoned them, or thrown them away. Thus, those tires are "discarded" within the ordinary meaning of that word, just as the waste left at the curb for trash collectors to pick up is discarded. It is "an extraordinary distortion of the English language" to say that when something is thrown away, it is not discarded. *ABR*, 208 F.3d at 1053.

Consistent precedent in this Court confirms that material discarded by its original owner is discarded within the ordinary meaning of the term. This Court has made clear that "once material qualifies as 'solid waste,'"—*i.e.*, has been discarded—"something derived from it retains that designation even if it might be reclaimed and reused at some future time." *ABR*, 208 F.3d at 1056 (discussing *API I*, 906 F.2d 729, and *AMC II*, 907 F.2d 1179). This commonsense principle stems from this Court's first decision construing RCRA's definition of solid waste. In *AMC I*, this Court expressly recognized EPA's RCRA authority to regulate "used oil." 824 F.2d at 1187 n.14. The *AMC I* Court found that although regulating "undiscarded oils at petroleum refineries" would exceed EPA's RCRA authority to

28

regulate solid waste, regulating "'used oil' collected by and utilized in the 'oil recycling industry'" is "consistent with an everyday reading of the term discarded." *Id.* The Court could not have meant that used oil has been discarded by the oil recyclers, which "collect discarded used oils, distill them, and sell the resulting material for use as fuel in boilers." *Id.* Rather, used oil falls within the ordinary meaning of "discarded" because it is discarded by its original owner before it ever gets "collected." *Id.* Having been discarded once, that oil is "discarded" within the ordinary meaning of the word. *ABR*, 208 F.3d at 1054-55 (quoting *AMC I*, 824 F.2d at 1187 n.14).

Relying on this Circuit's caselaw, the Eleventh and Fourth Circuits have made the same point. *ILCO*, 996 F.2d at 1131-32; *Owen Elec. Steel Co. of S.C. v. Browner*, 37 F.3d 146, 150 (4th Cir. 1994). *ILCO* addressed the status of spent car batteries that a lead smelting company had purchased so that it could extract certain components and recycle the lead they contained. 996 F.2d at 1128-29. The company argued that "<u>it</u> has never 'discarded' the [battery components] and, therefore the material it recycles is not 'solid waste' as defined in RCRA §6903(27)." *Id.* 1131 (emphasis added). The Court disagreed:

> <u>Somebody</u> has discarded the battery in which these components are found. This fact does not change just because a reclaimer has purchased or finds value in the components.

*Id.*; *accord Owen Elec. Steel*, 37 F.3d at 150 (quoting *ILCO*).

At various points in the rule, EPA acknowledges that a once-discarded material is a waste. For example, EPA states that "the statutory definition of solid waste turns on whether or not a material has been discarded <u>in the first instance</u>." 76 Fed. Reg. 15,508/2 (emphasis added), JA____. Nonetheless, EPA takes the position that worn-out tires discarded by their owners at tire stores "are not 'discarded in the first instance'" so long as they are <u>subsequently</u> "managed under the oversight of state and other established tire collection programs." *Id.* 15,534/1, JA____. Likewise, it evidently takes the position that motor oil discarded by its owner at service stations is not discarded in the first instance, so long as it is <u>subsequently</u> collected and distilled by oil recyclers, and that the wooden parts of demolished buildings that are discarded by the buildings' owners and hauled away are not discarded in the first instance, so long as they are <u>subsequently</u> found to be "clean." *See* 40 C.F.R. §241.2 (including both materials in definition of "traditional fuels"). EPA evidently also does not view paper and cardboard that people discard as being discarded in the first instance, so long as it <u>subsequently</u> makes its way to recycling facilities where recycling operations separate out the unrecyclable parts and burn them. *See* 76 Fed. Reg. 15,486/2-87/1 (deeming cardboard rejects non-waste when burned at pulp and paper mills), JA____-__; EPA-HQ-RCRA-2008-0329-2007 at 1-2 ("recycling process residuals," including cardboard rejects, are

30

"paper fiber that is unusable (due to impurities, fibers too small for recycling process) resulting from the recycling process"), JA____-__.

Whatever EPA might mean by "first instance," materials discarded by their original owners have been "discarded" within that term's ordinary meaning. Therefore, such materials are solid waste.[9] *ABR*, 208 F.3d at 1056; *AMC I*, 824 F.2d at 1193. Nor does it matter how a discarded material is handled <u>after</u> it has been discarded. *ABR*, 208 F.3d at 1054-55 (quoting *AMC I*, 824 F.2d at 1187 n.14); *ILCO*, 996 F.2d at 1129, 1131-32. As explained above, because such materials are already "discarded," they are already "waste." *See also ABR*, 208 F.3d at 1052 ("Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning."). Indeed, if mere collection of a material sufficed to keep it from being discarded, then virtually nothing would be waste. For example, because the garbage that people leave at the curb is "collected," even ordinary household garbage would not be waste. As a result, RCRA's ban on disposing solid waste

---

[9] *ABR* makes clear that "something derived from" solid waste remains solid waste "even if it might be reclaimed and reused at some future time." 208 F.3d at 1056. Thus, cardboard rejects are even more plainly solid waste because they are derived from discarded cardboard and are rejected from the recycling process because they <u>cannot</u> be reused.

31

into "open dumps," *see* 42 U.S.C. §§6903(14), 6944(b), 6945(a), would not prevent the sanitation departments that collect garbage and run dumps from operating the open dumps RCRA banned. *See Greenlaw v. United States*, 554 U.S. 237, 251 (2008) ("We resist attributing to Congress an intention to render a statute so internally inconsistent.").

*A fortiori*, it is irrelevant under RCRA that scrap tires, used oil, and construction debris are "used as a fuel in a combustion unit," 78 Fed. Reg. 9153/3, JA____. That argument, which is EPA's primary rationale for excluding them categorically from the definition of solid waste, *see id.* 9153/3-54/1, JA____-__, goes exclusively to the <u>last</u> thing that happens to these materials, not to whether they are discarded in the <u>first</u> instance. Burning tires that have been collected does not prevent tires from being discarded in the first instance any more than burning municipal garbage that has been collected prevents garbage from being discarded in the first instance.

## 2.     Once Discarded, a Secondary Material Cannot Be Processed into A Non-Waste Fuel Under RCRA.

EPA's rule creates a separate exclusion from the definition of solid waste for secondary materials that are undisputedly "discarded" and therefore within the statutory definition of "solid waste," 42 U.S.C. §6903(27). Specifically, it exempts discarded materials that are subsequently "processed to produce a fuel." 40 C.F.R.

32

§241.3(b)(4). For example, discarded tires "that have been shredded/chipped into [tire-derived fuel] with the wire removed" are excluded. 76 Fed. Reg. 15,537/3, JA_____. Similarly, EPA states that "contaminated [construction and demolition] wood that has been processed to remove contaminants" would "likely" be excluded. 78 Fed. Reg. 9138/2, JA_____.

A once-discarded material may be processed and burned for fuel, but that does not change the fact that it is waste. In *ABR*, this Court affirmed that EPA has RCRA authority to regulate oil recyclers, which "typically collect discarded used oils, distill them, and sell the resulting material for use in boilers." 208 F.3d at 1054 (quoting *AMC I*, 824 F.2d at 1187 n.14). It further affirmed that RCRA regulation of all these activities is "consistent with an everyday reading of the term 'discarded.'" *Id.* 1054-55. Because EPA has RCRA authority only over materials that are "solid waste," *AMC I*, 824 F.2d at 1178, *ABR* necessarily affirms that used oils themselves continue to be "discarded" within the ordinary sense of the word when they are subsequently "collect[ed]," "distill[ed]," and sold "for use as fuel in boilers" by oil recyclers. 208 F.3d at 1054-55. Otherwise, EPA would not have RCRA authority to regulate the collection, distillation, and sale of used oil for fuel—as this Court has repeatedly explained it does. *Id.*; *API I*, 906 F.2d at 741 n.16; *AMC I*, 824 F.2d at 1187 n.14.

33

EPA argues that *ABR* was addressing only the "processing activity" and "in no way opines on whether the resulting fuel is waste." 76 Fed. Reg. 15,475/2, JA____. But *ABR* affirmed that EPA has RCRA authority over <u>all</u> the oil recyclers' activities, from collecting the used oil, to distilling it, to selling it for fuel. 208 F.3d at 1054-55. When used oil is sold for fuel, all processing is complete. Thus, used oil remains "discarded" within "an everyday reading of the term" <u>after</u> it is processed, *i.e.*, when it is sold "for use as fuel in boilers." *Id.* Contrary to EPA's claim, *ABR* makes clear that processing used oil does not make it any less discarded.

EPA also argues that *ABR* and *AMC I* "do not stand for the proposition that any product resulting from recycling must be a waste" because "[s]uch a view would make almost every aluminum can from which we drink our sodas or newspapers on which we read the news 'solid wastes.'" 76 Fed. Reg. 15,475/1-2, JA____. EPA is correct to a point: *ABR* and *AMC I* stand for the narrower proposition that discarded materials remain waste when they are processed for use as a fuel. Because this case does not address the processing of waste into aluminum cans or newspapers, the Court can follow *ABR* and *AMC I* here without reaching the status of those products.

In any event, RCRA shows that, unlike EPA, Congress did not equate burning waste for energy with recycling waste into products. Congress deliberately

34

separated its findings on materials recovered from waste from its findings on

energy recovered from waste, noting in the energy subsection that "solid waste

represents a potential source of solid fuel, oil, or gas that can be converted into

energy." 42 U.S.C. §6901(c), (d); *see also id.* §6941a(2)-(5) (similar findings).

Similarly, Congress took care in RCRA's definitions section to draw a distinction

between "material" recovered from solid waste and "energy" recovered from solid

waste. *Id.* §6903(20) (defining "recovered resources" as "material <u>or</u> energy

recovered from solid waste" (emphasis added)), (22) (similar definition of

"resource recovery");[10] *see* 42 U.S.C. §6903(19) (defining "recovered material"

without once referring to energy or fuel); *e.g.*, *North Carolina v. EPA*, 531 F.3d

896, 910 (D.C. Cir. 2008) ("Canons of construction ordinarily suggest that terms

connected by a disjunctive be given separate meanings, unless the context dictates

otherwise…." (ellipsis in original)); *In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996)

(use of disjunctive indicates "separate and distinct alternatives" (internal quotation

marks omitted)). And, when Congress directed EPA how to prioritize research on

resource recovery, it ordered EPA to study "techniques of energy recovery from

---

[10] "Recovery" and "recover" are statutorily undefined and thus in this context have their ordinary meaning of reclaiming or to reclaim. *See, e.g.*, *Hamilton v. Lanning*, 560 U.S. 505, 513 (2010); *Bluewater Network v. EPA*, 370 F.3d 1, 13 (D.C. Cir. 2004); *Webster's New Universal Unabridged Dictionary* 1509 (deluxe 2d ed. 1983); *Webster's Seventh New Collegiate Dictionary* 716 (1969).

solid waste" that specifically included "dry shredded fuel systems, pyrolysis, densified refuse-derived fuel systems, anerobic digestion, and fuel and feedstock preparation systems"—all forms of processing solid waste. 42 U.S.C. §6982(c). Thus, under RCRA, when solid waste is physically, chemically, biologically, or otherwise processed before being burned, the energy recovered is nonetheless recovered <u>from solid waste</u>.

By equating energy recovered from solid waste with material recovered from solid waste, 76 Fed. Reg. 15,475/3, 15,537/2, JA____, ____, EPA nullifies the distinction Congress drew between the two. EPA's interpretation thus contravenes Congress's intent that there be a line between recovered material and recovered energy, and allows waste to be turned to energy without being subject to the protections Congress intended RCRA and the Clean Air Act working together to provide. *See Chevron*, 467 U.S. at 842-43.

**B.      EPA's Rule Contravenes the Clean Air Act and Defeats Congress's Purpose in Linking RCRA with the Clean Air Act.**

Both EPA's contention that scrap tires and other discarded materials are not solid waste and the agency's claim that materials that are undisputedly discarded cease to be waste if processed as fuel conflict with the Clean Air Act as well as RCRA, further thwarting Congress's comprehensive regulatory scheme.

36

On the most specific level, EPA's rule conflicts with §129(g)(1)(B), which

excludes from the definition of solid waste incinerator

> qualifying small power production facilities, as defined in section
> 796(17)(C) of Title 16, or qualifying cogeneration facilities, as
> defined in section 796(18)(B) of Title 16, which burn homogeneous
> waste (such as units which burn tires or used oil, but not including
> refuse-derived fuel) for the production of electric energy or in the case
> of qualifying cogeneration facilities which burn homogeneous waste
> for the production of electric energy and steam or forms of useful
> energy (such as heat) which are used for industrial, commercial,
> heating, or cooling purposes.

42 U.S.C. §7429(g)(1)(B) (emphasis added). Although the Clean Air Act narrowly

limits what facilities can burn tires or used oil without being incinerators, EPA

now says any facility can burn them without being a "solid waste incineration unit"

under Clean Air Act §129. Further, under EPA's rule, virtually all scrap tires

burned as fuel and used oil are not solid waste. EPA-HQ-RCRA-2008-0329-1822

at 11 ("[f]ar less than 10%" of scrap tires burned as fuel would likely be waste),

JA____; EPA-HQ-RCRA-2008-0329-1827 at 4, 6 (under 4% of, or "nearly all,"

used oil is on-spec), JA____, ____. Thus, EPA's categorical exclusion of scrap

tires and used oil from the RCRA definition of solid waste renders "insignificant, if

not wholly superfluous," the specific and narrow exemption that Congress crafted

for just some units that burn these wastes, contrary to repeated holdings that the

Supreme Court and this Court have long been "reluctant to treat statutory terms as

surplusage in any setting." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal

37

quotation marks omitted); *accord, e.g.*, *City of Roseville v. Norton*, 348 F.3d 1020, 1028 (D.C. Cir. 2003) (rejecting reading under which statutory "exception would be virtually bereft of meaning").

Moreover, Congress made plain in §129 that units burning refuse-derived fuel are <u>not</u> eligible for the limited exemption it chose to provide. 42 U.S.C. §7429(g)(1)(B). By allowing any unit to burn fuel derived from solid waste if the fuel is "sufficiently processed," EPA unlawfully overrides Congress's deliberate choice not to provide <u>any</u> exemption for refuse-derived fuel. *E.g.*, *Shays v. FEC*, 528 F.3d 914, 933 (D.C. Cir. 2008) ("the regulation fails because it allows what [the statute] directly prohibits.").

Further, §129 uses tires and used oil as examples of "waste." 42 U.S.C. §7429(g)(1)(B). Thus, Congress plainly thought that these two materials <u>are</u> wastes within the meaning of RCRA §1004(27), 42 U.S.C. §6903(27), when it enacted the Clean Air Act. Issuing a regulatory definition of waste under RCRA that excludes even these two materials that are specifically called out as wastes in the Clean Air Act is the antithesis of a "careful accommodation of one statutory scheme to another." *Southern S.S.*, 316 U.S. at 47; *accord W. Va. Univ. Hospitals v. Casey*, 499 U.S. 83, 88-92, 100-01 (1991) (superseded by statute) (rejecting reading of statutory term where reading would render use of terms in other statutes "an inexplicable exercise in redundancy").

38

Moreover, §129(g)(6) makes clear that Congress wanted the same definition of solid waste to apply under both RCRA and the Clean Air Act. 42 U.S.C. §7429(g)(6) ("'solid waste' … shall have the meaning[] established by the Administrator" under RCRA) (emphasis added); *see Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000) ("'[i]t is a rule of law well established that the definite article "the" particularizes the subject which it precedes.'") (citation omitted; alteration in original). Similarly, RCRA provides that EPA must integrate RCRA and Clean Air Act provisions "to the maximum extent practicable," giving effect to the goals and policies in both statutes. 42 U.S.C. §6905(b)(1). Yet EPA has given the term "solid waste" two completely different meanings for RCRA and Clean Air Act purposes.

In an analogous situation, the Supreme Court addressed a statutory term that applied "without differentiation" to three categories. *Clark v. Martinez*, 543 U.S. 371, 378 (2005). It held that "[t]o give these same words a different meaning for each category would be to invent a statute rather than interpret one." *Id.*; *accord Holmes Grp. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 833-34 (2002) (warning against such "interpretive necromancy"). In RCRA, the term "solid waste" applies without differentiation to all waste, whether it is hazardous or non-hazardous, and Clean Air Act §129 indicates that Congress wanted the same definition to apply under the Clean Air Act. *E.g.*, *AMC I*, 824 F.2d at 1179. For the

39

purpose of RCRA's hazardous waste provisions, EPA has long defined "solid waste" to include materials that are "burned to recover energy." 40 C.F.R. §261.2(c)(2) (emphasis added). Yet, for the purpose of Clean Air Act regulation only, EPA now defines this same statutory term to exclude materials because they are burned to recover energy. By giving the same statutory term, "solid waste," two conflicting meanings, EPA has "invent[ed] a statute rather than interpret[ed] one." *Clark*, 543 U.S. at 378. Further, by giving the term different meanings for regulation under RCRA and under the Clean Air Act, EPA has frustrated congressional intent—plainly expressed in both Clean Air Act §129 and RCRA §1006—that Clean Air Act and RCRA provisions be integrated.[11]

On a more general level, Congress knew full well that many incinerators recover energy from burning waste. Many municipal waste combustors are known as "waste-to-energy" facilities because they were designed to recover energy from burning municipal garbage. *E.g.*, Energy Recovery Council, About Us, http://www.wte.org/about (last accessed Apr. 25, 2014), JA____. Likewise, some

---

[11] In fact, EPA has only ever provided fragmentary meanings for "solid waste": one that applies by its terms only to hazardous waste regulation under RCRA, 40 C.F.R. §261.1(b)(1); another that applies only to "non-hazardous secondary materials that are combusted" and that was written exclusively "for purposes of [Clean Air Act] sections 112 and 129," 76 Fed. Reg. 15,502/2-3, JA____; *accord, e.g.*, *id.* 15,495/1, JA____; and five others that apply in various ways to non-hazardous solid waste, *see id.* 15,462/1-2 (listing 40 C.F.R. §§240.101(y), 243.101(y), 246.101(bb), 257.2, 258.2), JA____.

medical waste incinerators recover energy from burning medical waste. 74 Fed.

Reg. 51,368, 51,376/3 (Oct. 6, 2009), JA____. Nonetheless, §129 makes clear that

Congress wanted these facilities to be regulated as incinerators. 42 U.S.C.

§7429(a)(1)(A)-(B). As this Court held in *NRDC*, Congress intended that all

facilities that burn "any solid waste material at all" are incinerators regardless of

whether they recover energy, unless they are among the small set of units that

§129(g)(1) expressly exempts from the definition of incinerator. 489 F.3d at 1258-

60.

　　Having tried but failed to insert an exemption for energy-recovery units into

the Clean Air Act, EPA now seeks to insert one into RCRA. Instead of defining

incinerator under the Clean Air Act to exclude <u>combustion facilities that burn</u>

<u>waste for energy</u>, it now defines solid waste under RCRA to exclude discarded

materials <u>when they are burned for energy in combustion units</u>. For example, EPA

excludes scrap tires gathered by tire collection programs "when used as fuel in a

combustion unit." 40 C.F.R. §241.4. But it declines to determine whether they are

discarded if ultimately used for any other purpose: "we are not making any

determination that non-hazardous secondary materials are or are not solid wastes

for other possible beneficial uses." 76 Fed. Reg. 15,495/1, JA____. The distinction

EPA draws between units that burn waste with energy recovery and those that burn

waste without energy recovery is irrelevant under the Clean Air Act. Making Clean

Air Act regulation of combustion units turn on this irrelevant distinction is scarcely "careful accommodation" of the two statutes. *Southern S.S.*, 316 U.S. at 47. EPA must "minimize[] the impact of its actions on the policies of the" Clean Air Act, not increase them. *Can-Am Plumbing v. NLRB*, 321 F.3d 145, 153-54 (D.C. Cir. 2003) (internal quotation marks omitted); *accord* 42 U.S.C. §6905(b)(1).

Ultimately, Congress intended RCRA and the Clean Air Act to work together, and EPA must harmonize them—especially here, where its rule governs an interaction between the two statutes that Congress expressly created. *See Roberts v. Sea-Land Servs.*, 132 S. Ct. 1350, 1356 (2012) (phrase was unambiguous in context because only one reading of it "makes [provision] a working part of the statutory scheme…and avoids gamesmanship in [relevant] process"); *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120, 133 (2000) (court must interpret statute "as a symmetrical and coherent regulatory scheme" and look at Congress's choices in related statutes). Instead, EPA misreads both RCRA and the Clean Air Act in a way that conflicts with each statute and impermissibly "permit[s] an end-run around" the statutory scheme. *Hays v. Sebelius*, 589 F.3d 1279, 1282 (D.C. Cir. 2009).

42

## II.   EPA'S RULE IS AN UNREASONABLE INTERPRETATION OF RCRA AND THE CLEAN AIR ACT AND IS ARBITRARY.

Even if EPA's rule did not contravene RCRA and the Clean Air Act, it would still be unlawful and arbitrary[12] because, as discussed below, it takes inconsistent positions on interpreting RCRA and the Clean Air Act and on addressing different materials, as well as relying on non-sequiturs or, in some cases, on nothing at all.

**Interpreting RCRA and the Clean Air Act.**

EPA's interpretation of RCRA and the Clean Air Act taken together is irrational and arbitrary in three ways. First, the agency was inconsistent about the scope of its rulemaking. On the one hand, it said that the rule <u>only</u> establishes "a framework for determining whether a non-hazardous secondary material is or is not a solid waste when burned as a fuel or ingredient in a combustion unit," 76 Fed. Reg. 15,515/2, JA____,[13] and thus "is limited for purposes of determining [Clean Air Act] 129 applicability." *Id.* 15,529/3, JA____. On the other, it said that

---

[12] *See Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000) ("we have recognized that an arbitrary and capricious claim and a *Chevron* step two argument overlap, and because of that we have not been sticky as to whether an argument in the area of overlap is characterized as a *Chevron* step two claim or as an arbitrary and capricious challenge.").

[13] *Accord id.* 15,458/3, 15,462/2, 15,473/3, 15,495/1, 15,545/1, 15,546/1, /3, 15,549/3-50/1 (codified at 40 C.F.R. §241.1), JA____, ____, ____, ____, ____, ____, ____-__.

43

the rule "determines whether non-hazardous secondary materials are a solid waste, or not under RCRA," <u>regardless</u> of whether a material is combusted. *Id.* 15,536/2, JA____.[14] Either the rule is limited to determining the applicability of Clean Air Act §129 (itself an unlawful and arbitrary position), or the rule is defining what materials are non-hazardous solid waste under RCRA, regardless of whether they will ultimately be burned. It cannot be both. The incoherence of EPA's two positions makes the rule they undergird unlawful and arbitrary. *See Business Roundtable v. SEC*, 647 F.3d 1144, 1153-54 (D.C. Cir. 2011) (agency reasoning is arbitrary where it is "internally inconsistent"); *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133, 151 (D.C. Cir. 1984) (interpretation fails under *Chevron* step two where agency failed to "consider[] matter in a detailed and reasoned fashion").

Second, when EPA asserted that it was only determining whether materials were waste "when burned" in a stationary source, the agency fundamentally misconceived its task. As discussed above, Congress made plain that it wanted the same definition of solid waste to apply to the Clean Air Act as applies to RCRA. The question EPA needed to answer was thus not whether a material is waste when burned, but whether a material is a waste, *i.e.*, has been discarded. EPA claims to

---

[14] *Accord, e.g.*, *id.* 15,472/3 ("In this rule, EPA needs to decide whether secondary material is discarded in the first instance, and whether [a] transfer represents a legitimate non-waste activity."), JA____.

recognize that once a material has been discarded, it remains solid waste even if it is ultimately burned, *e.g.*, 76 Fed. Reg. 15,508/2, JA____, but its rule excludes materials that are plainly discarded by their original owner. *See supra* pp.27-32. Because EPA's fragmented definitions of solid waste rely on handling and combustion <u>after</u> discard—factors that are irrelevant under RCRA—and "leads to irrational results in practice," it is "unreasonable under *Chevron* step two" and arbitrary. *Int'l Alliance v. NLRB*, 334 F.3d 27, 35 (D.C. Cir. 2003); *see State Farm*, 463 U.S. at 43.

Third, the agency rejected a comment urging it to "consider the [Clean Air Act] when defining solid waste under RCRA." 76 Fed. Reg. 15,470/1-2, JA____. But EPA then proceeded to rely on the Clean Air Act in determining what counts as a "contaminant" that renders a secondary material more like a solid waste than like a fuel. *Id.* 15,523/3-24/1, /3, JA____-__. Indeed, EPA rejected a broader definition of "contaminant" on the basis that Clean Air Act §129 defines the contaminants that matter. *Id.* 15,524/3-25/1, JA____-__. EPA's selective and inconsistent reliance on the Clean Air Act to justify its RCRA interpretation is unlawful. *See Business Roundtable*, 647 F.3d at 1153-54; *Rettig*, 744 F.2d at 151.

**Specific Materials.**

EPA's explanation for including "alternative fuels developed from virgin materials that can now be used as fuel products" in the category "traditional fuels,"

45

76 Fed. Reg. 15,478/1, JA____, is internally inconsistent. EPA claimed that "it is using the term, 'traditional,' more in the sense that we have a product that is created for its use as a fuel." *Id.* 15,477/1, JA____; *accord id.* 15,478/1 ("'Traditional fuels' is defined in today's final rule as materials that are produced as fuels and are unused products that have not been discarded and therefore, are not solid waste…."), JA____. Yet in rejecting industry's request that scrap tires be deemed a traditional fuel, EPA explained (correctly) that "[c]ement kiln users do not ask tire manufacturers to produce tires for burning in the kilns" and that "tires are not produced for their fuel value." *Id.* 15,495/3, 15,507/3, JA____, ____. The same point applies equally to construction and demolition wood, used oil, crop residues, urban wood, and the other "alternative fuels" EPA deems "traditional," but which are also "not produced for their fuel value," regardless of whether they are clean, on-spec, or in another condition. EPA's claim that these materials were "produced as fuels" is implausible and inconsistent with its treatment of similar materials, and thus arbitrary. *See State Farm*, 463 U.S. at 43; *Transactive*, 91 F.3d at 237.

For tires, EPA's analysis is irrational because its conclusion that scrap tires were not initially discarded is not supported by the record, as discussed above. *See State Farm*, 463 U.S. at 43. Further, it is based on a non-sequitur. EPA concludes that "the annually generated scrap tires that are removed from vehicles under

46

established tire collection programs shows that they are not being discarded, as evidenced by the dramatic decrease in the number of tires in waste tire dumps." 76 Fed. Reg. 15,534/2, JA____. This does not follow. In fact, all the "dramatic decrease" shows is that more discarded tires are being burned instead of dumped. It says nothing about whether the tires are being discarded in the first instance. Only by pretending that the only form of discard is dumping can EPA reach its preferred conclusion. But discard goes beyond dumping. Congress defined "disposal" to mean placing solid waste on land or in water, but used a different, broader term— "discarded"—in defining solid waste. 42 U.S.C. §6903(3), (27); *see AMC I*, 824 F.2d at 1193 (discarded means "disposed of, abandoned, or thrown away"). EPA has failed to rationally consider whether scrap tires have been discarded when their owners throw them away. *See Fox v. Clinton*, 684 F.3d 67, 79-80 (D.C. Cir. 2012).

On used oil, EPA's analysis is irrational in two ways. First, it relies extensively on its regulations applying to used oil, 40 C.F.R. pt.279, in determining that on-spec used oil is not solid waste, *see* 76 Fed. Reg. 15,538/1, JA____,[15] but simultaneously asserts that those regulations "do not discuss or address whether used oil has been discarded, as commenters have claimed," *id.* 15,506/1, JA____.

---

[15] EPA also relies on these regulations to claim, *inter alia*, that EPA historically has viewed on-spec oil as non-waste and that off-spec oil can be rendered non-waste by processing into on-spec oil. *Id.* 15,503/2, 15,506/1, JA____, ____.

EPA cannot rationally say the regulations are determinative of discard status but do not address discard. *See Business Roundtable*, 647 F.3d at 1153-54; *Rettig*, 744 F.2d at 151.

Second, EPA did not rationally consider the question of whether used oil was initially discarded. It says that on-spec oil is not discarded, but off-spec oil is. 76 Fed. Reg. 15,502/2, 15,503/1 & n.108, JA____, ____. In fact, both are discarded in the same way, by drivers replacing their oil at service stations. Per EPA's research, used oil is tested to see whether it is on- or off-spec when it is processed into fuel, not before. *See* EPA-HQ-RCRA-2008-0329-1827 at 6, JA____. The driver who comes in for an oil change does not know or care whether his used motor oil is on- or off-spec: he just wants to dispose of his used oil and get fresh oil. Thus, EPA contends that used oil has different discard statuses depending on whether it is on- or off-spec even though the car owner does not know the answer to that question. There is no rational connection between the facts and the conclusion EPA drew. *State Farm*, 463 U.S. at 43.

EPA's treatment of cardboard rejects from paper recycling is also irrational, for it is inconsistent. EPA "believes materials, [*sic*] such as … paper residues … typically have been discarded." 76 Fed. Reg. 15,478/3, JA____. But EPA claims that these materials were generated at the paper mill and are "part of the industrial process," and thus not discarded. *Id.* 15,487/1, JA____; *see also* 78 Fed. Reg.

48

9173/1-2 (summarizing), JA_____. EPA had it right the first time, but, in any event, its analysis is internally inconsistent and cannot stand. *See Business Roundtable*, 647 F.3d at 1153-54; *Rettig*, 744 F.2d at 151.

**Legitimacy Criteria and Processing.**

EPA's approach to the "legitimacy criteria" was irrational. First, EPA rejected comments calling on EPA to consider a range of contaminants, like heavy metals and pathogens, that go beyond those pollutants listed in Clean Air Act §§112 and 129, because the listed pollutants are the ones for which EPA sets air emission standards. 76 Fed. Reg. 15,524/3-25/1, JA_____-__; *see also* 78 Fed. Reg. 9142/2-3, JA_____. Assuming that the contaminants in a material are relevant to whether it has been discarded, EPA has provided no record basis for assuming contaminants for which emission standards are required under §129 and §112 are relevant but other contaminants are not. *Transactive*, 91 F.3d at 237. Further, EPA's conclusion that non-Clean Air Act contaminants are irrelevant does not follow from the fact that they are not regulated under the Clean Air Act. *See State Farm*, 463 U.S. at 43.

Second, part of EPA's requirement that a material "be managed as a valuable commodity," 76 Fed. Reg. 15,551/2-3 (codified at 40 C.F.R. §241.3(d)(1)(i), (2)(i)), JA_____, does no work at all in distinguishing solid waste from non-solid waste. One condition is that the material "be adequately contained

49

to prevent releases to the environment."[16] *Id.* (codified at 40 C.F.R.

§241.3(d)(1)(i)(B)-(C), (2)(i)(B)-(C)), JA____. But in distinguishing non-wastes

from waste, EPA claimed that solid wastes are held "in a way that protects the

surrounding environment from the material." *Id.* 15,522/1, JA____; *accord id.*

15,526/2, JA____. Thus, the adequate containment condition requires only that the

material be held as though the material is a solid waste. It says nothing about

whether the material is being "legitimately" used as a non-waste. *State Farm*, 463

U.S. at 43.

    Finally, EPA provides no record support for its presumption that "self-

implementing" tests will be effective in preventing abuse of its exclusions. EPA

made the legitimacy criteria (for materials used on-site) and the processing test

"self-implementing," meaning the combustor alone determines whether what it is

combusting is waste. *See* 76 Fed. Reg. 15,481/1-2 & n.32, JA____. The facility

need not actually test the contaminant levels in the materials it burns, but can

instead rely on "expert or process knowledge," without revisiting that reliance so

long as the facility continues to burn "the same <u>type</u> of [non-hazardous secondary

material] as when the original assessment was made." 78 Fed. Reg. 9144/3,

9146/2, 9152/2 (emphasis added), JA____, ____, ____; *see also id.* 9139/1 (facility

---

[16] Another condition is that the material not be held for an unreasonably long time.
*Id.* (codified at 40 C.F.R. §241.3(d)(1)(i)(A), (2)(i)(A)), JA____.

need not actually test for contaminant levels when determining that "cellulosic biomass" it burns is "clean"), JA____. This puts the fox in control of the henhouse. EPA-HQ-RCRA-2008-0329-1038 at 3, JA____; *cf. NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010) (superseded by statute) ("self-serving views of the regulated entities" do not support rule); *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 803 (D.C. Cir. 2007) (rate-making held arbitrary where entity on which FERC relied lacked "incentives" that would render it reliable). Further, EPA's abdication of oversight arbitrarily allows facilities to assume away contamination on the basis that they don't expect contaminants, without checking to see if there are contaminants. *See New York v. EPA*, 413 F.3d 3, 34 (D.C. Cir. 2005) (rejecting exemption from recordkeeping requirement because "EPA has failed to explain how, absent recordkeeping, it will be able to determine whether sources have accurately concluded that they have no 'reasonable possibility' of significantly increased emissions"); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 577 (D.C. Cir. 2004) (rejecting "circular" agency reasoning).

## CONCLUSION AND RELIEF REQUESTED

For the reasons given above, Petitioners request that the Court vacate the definitions of "traditional fuel" and "clean cellulosic biomass" in 40 C.F.R. §241.2 and the exceptions from EPA's definition of solid waste given in 40 C.F.R. §§241.3(b)(4) and 241.4(a)(1), and remand the entirety of the challenged rules for

51

EPA to promulgate a new definition of solid waste that is consistent with RCRA

and the Clean Air Act.


DATED: April 28, 2014

Respectfully Submitted,

/s/James S. Pew
James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Petitioners*

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Final Brief of Petitioners contains 11,174 words, as counted by counsel's word processing system, and thus complies with the applicable word limit established by the Court.

DATED: April 28, 2014

/s/ James S. Pew
James S. Pew

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April, 2014, I have served the

foregoing **Proof Opening Brief for Environmental Petitioners** on all registered

counsel through the Court's electronic filing system (ECF).


/s/ James S. Pew
James S. Pew

# DECLARATIONS

## <u>TABLE OF CONTENTS</u>

**Declarants**                                                                                   **Page**

Glen Besa ............................................................................................. DEC001

Mary Booth .......................................................................................... DEC005

Martha Fisher Briggs .......................................................................... DEC008

Maxine Centala .................................................................................... DEC010

William Fontenot ................................................................................. DEC013

Robert Palzer ....................................................................................... DEC016

Sue Pope .............................................................................................. DEC020

Jane Williams ...................................................................................... DEC023

### DECLARATION OF GLEN BESA

1.      I have been a member of the Sierra Club since 1988, and have worked for Sierra Club since 1996. I am currently the Director of Sierra Club in Virginia and have held this position since March 14, 2008. I enjoy my work, which helps protect Virginia's natural environment and communities from harmful threats such as industrial pollution. In particular, my work allows me to protect beautiful natural regions of Virginia, including unique Eastern Shore treasures like Chincoteague Island, Chincoteague Bay and the many state parks, preserves, and beaches in the surrounding area.

2.      As its Director, I am aware that Sierra Club in Virginia is actively involved with environmental issues throughout the state, including air and water quality on the Eastern Shore.

3.      I reside in Richmond, VA 23234. I have lived at this address for approximately 10 years.

4.      Professionally, I am engaged in environmental issues, and have a strong interest in air and water quality. I work directly with Sierra Club's air and water quality efforts in Virginia, including other efforts concerned with toxic pollution in Radford and Hopewell, Virginia.

5.      Personally, I spend significant time outdoors, enjoy outdoor recreational areas, and am concerned about air pollution because I have asthma. I also make efforts to reduce my own impact on the environment. I take measures to reduce my consumption of energy and water resources, I purchase renewable electricity for my home, and drive a hybrid Toyota Prius.

6.      For both professional and personal reasons, I am on an email mailing list to receive, and I regularly review, Virginia Department of Environmental Quality permits. I keep myself informed of new and ongoing regulatory oversight of facilities throughout the state, including those within areas I frequent such as the Eastern Shore.

7.      I travel to Chincoteague regularly with my family. I have made five or six trips in the last decade, typically in the spring. My most recent trips were between March 12-16, 2012 and May 4-6, 2013. My family and I stay at the Refuge Inn, adjacent to the Chincoteague National Wildlife Refuge, and we plan to continue our regular trips indefinitely into the future.

8.      While visiting Chincoteague, my family and I enjoy recreating in and around the refuge by spending extensive time outdoors. We enjoy hiking, birdwatching, and seeing the many plants and animals in the refuge and surrounding area.

9.      My wife and I also enjoy the many inlets and bays around Chincoteague, and have taken a tour of Chincoteague Bay.

10.     While in the area, my family enjoys dining in local Chincoteague restaurants, and I in particular enjoy eating locally caught seafood. I also drink tap water, and do so whenever visiting Chincoteague.

**DEC001**

11.     I am aware that the KmX Chemical ("KmX") plant in New Church, VA is located less than six miles from the waters at Horntown Bay, and less than nine miles from Chincoteague Island.

12.     From its state operating permit, I understand that KmX has a boiler that burns distillate fuel, on-spec used oil, and so-called comparable fuels (a separate regulatory exemption that Sierra Club is also challenging). The KmX plant is allowed to burn used oil that contains such pollutants as arsenic, cadmium, lead, and mercury.

13.     For regulatory purposes, the boiler is an area source of hazardous air pollutants, so is subject to EPA's standards for area source boilers, which impose no numerical standards on an existing oil-fueled boiler like this. The boiler is not subject to any numerical standards for hydrogen chloride, cadmium, mercury, or dioxins and dibenzofurans.

14.     I am aware that EPA has defined solid waste to exclude on-spec used oil. If EPA's definition of solid waste included on-spec used oil, I understand that the KmX plant's boiler would be subject to numerical standards for hydrogen chloride, cadmium, mercury, and dioxins and dibenzofurans that would reflect the maximum degree of reduction that similar plants have achieved and that is achievable. Similarly, although the boiler is currently subject to numerical standards for pollutants like particulate matter, sulfur dioxide, oxides of nitrogen, carbon monoxide, and lead, if EPA's definition of solid waste included used oil, those standards would also have to reflect the maximum degree of reduction that similar plants have achieved and that is achievable—a high standard.

15.     I am also aware that with a broader definition of solid waste, the boiler would be subject to monitoring and reporting requirements, as well as operator training standards. In addition, it would have to get a Title V operating permit, per the requirements of the federal Clean Air Act. Members of the public, like Sierra Club and me, could participate in the permitting process, and information about the plant and its compliance with standards would also be made available to the public.

16.     I am personally and professionally concerned that EPA's definition of solid waste allows KmX to harm both human health and the environment on Chincoteague Island, the Chincoteague National Wildlife Refuge, and in the Chincoteague Bay. I am also concerned that EPA's definition deprives me of rights and information I would otherwise have.

17.     Because I suffer from asthma, I am concerned that I will experience respiratory problems stemming from KmX's burning of waste without emissions testing or oversight and under conditions insufficient to protect my health. In addition, I am concerned that my exposure and my family's exposure to emissions from KmX's waste combustion put us at risk of suffering other serious adverse effects associated with toxic emissions that waste combustors such as KmX emit. Therefore, KmX's actions injure my enjoyment of being outdoors, lessening both the aesthetic and recreational value of my time on Chincoteague Island and Chincoteague Bay.

**DEC002**

18.     Because I enjoy local seafood and drink tap water in Chincoteague, I am concerned about ingesting toxins originating from KmX as a result of its burning of waste without otherwise applicable health and environmental protections under the Clean Air Act.

19.     Because EPA's definition of solid waste allows KmX to bypass otherwise applicable permit and monitoring requirements, I am concerned that Sierra Club is hindered in its ability to gather information about KmX's conduct and is unable to be involved in permitting and enforcement proceedings where appropriate. Therefore, I am concerned that the definition of solid waste prevents Sierra Club from educating its members and the public regarding KmX's conduct, and causes procedural injuries because Sierra Club is unable to contribute to permitting and enforcement actions under the Clean Air Act.

20.     If EPA's definition of solid waste were broader, I understand that KmX's boiler would become subject to the full range of standards and other requirements that benefit me, as Congress originally intended. Accordingly, a broader definition that encompassed wastes like used oil would redress my concerns over my and my family's health; would restore my aesthetic and recreational enjoyment of Chincoteague Island and its natural environment; and can help protect human health and the environment in Chincoteague, Chincoteague Bay, and the many parks, preserves, and beaches of the Eastern Shore. It would also redress the injuries to Sierra Club's educational programs and procedural participation in permitting and enforcement actions under the Clean Air Act.

21.     Similarly, I am aware from its Title V permitting papers that Dominion Energy recently converted a power station in Hopewell from burning coal to burning so-called "clean cellulosic biomass," which includes wood wastes, from, for example, land clearing.

22.     This power station is about 15 miles from my home. In addition, my work for Sierra Club takes me to Hopewell from time to time, and I plan to go there again shortly for work. When I am there, I breathe the air.

23.     Because in its definition of solid waste, EPA has deemed the wood wastes that the power station burns not to be wastes, the power station is not considered an incinerator. Instead, it is subject to emissions limits as a major source boiler.

24.     I am aware that if the power station were an incinerator, it would have to be subject to stringent numerical limits on its emissions of cadmium, lead, dioxins and furans, sulfur dioxide, and oxides of nitrogen. As a major source boiler, it is not. Similarly, from a recent Partnership for Public Integrity report, http://www.pfpi.net/wp-content/uploads/2014/04/PFPI-Biomass-is-the-New-Coal-April-2-2014.pdf, I am aware that the standards that apply to boilers' emissions of particulate matter, carbon monoxide, and hydrogen chloride are laxer than the standards that apply to incinerators' emissions.

25.     If EPA's definition of solid waste were broader, I understand that the power station would be subject to tougher limits on emissions of the pollutants I discussed above. As a result, it would be able to emit less of them into the air that I breathe. I would take less of them into my body, and risks to my health would be reduced. Further, my enjoyment of my everyday activities

**DEC003**

would be enhanced because I would have fewer concerns about the impacts of the power station's pollution on me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April  9th , 2014.

_____
Glen Besa

DEC004

# DECLARATION OF MARY S. BOOTH

1. I am the Director and lead analyst at the Partnership for Policy Integrity (PFPI), and have held this position since 2010. Prior to that, I was director of the Massachusetts Environmental Energy Alliance (MEEA).

2. PFPI is a non-profit environmental organization that operates as a branch of the Civil Society Institute, in Boston, MA.

3. PFPI's mission is to use science, policy analysis, and strategic communications to promote sound energy policy. A large proportion of PFPI's staff time and resources are dedicated to work that reduces emissions from industrial boilers and improves air quality. PFPI has a strong commitment to ensuring that the most effective technologies and strategies for pollution control are employed to reduce emissions, especially for the vulnerable populations that tend to live and work in the vicinity of industrial boilers.

4. My work requires that I be familiar with EPA's efforts to reduce emissions of air pollution from numerous sources, including industrial boilers and waste incinerators.

5. Both as Director of MEEA and Director of PFPI, I have worked on numerous matters involving federal air pollution regulations and rulemakings promulgated by the U.S. Environmental Protection Agency ("EPA") under the Clean Air Act. My work has particularly focused on biomass energy and the emissions from burning biomass in commercial and industrial boilers.

6. I am aware that the EPA recently promulgated air-toxics standards governing commercial boilers at area and major sources and commercial and industrial solid waste incinerators (CISWI), as well as a waste definition rule governing the applicability of those standards.

7. A substantial portion of PFPI's time has been devoted to analyzing emissions from biomass energy facilities, including examining multiple air permits from recently proposed facilities. Our work has given me a strong background to critically evaluate emissions from bioenergy and other fuel-burning facilities and the relevance of EPA's rules on emissions from boilers and the definition of waste versus biomass fuels.

8. In collaboration with other groups, I have submitted extensive written

**DEC005**

comments, including detailed technical analysis, during the public notice and comment period on EPA's proposed air toxics standards for commercial boilers and area and major sources, CISWI, and the waste-definition rule. Specifically, I contributed technical analysis to comments submitted on the June 4, 2010 version of the rules submitted by Clean Air Task Force et al, and PFPI joined comments submitted by Earthjustice in December 2011, as well as submitting our own comments to EPA.

9. PFPI recently released a report entitled "Trees, Trash, and Toxics: How Biomass Energy Has Become the New Coal." The report addresses, among other things, area sources of hazardous air pollutants that burn various secondary materials as fuel.

10. In the course of preparing this report, I reviewed 88 facilities that purport to burn "biomass" for energy in their boilers.

11. Of these facilities, at least 50 were "synthetic" minor sources of hazardous air pollutants. That is, although these sources have the potential to emit either 10 tons per year of a single hazardous air pollutant or 25 tons per year of a combination of hazardous air pollutants, they have been granted "synthetic" area source status by their state permitting authority.

12. Because these plants are considered area sources, the only numerical emission limit they have to meet for hazardous air pollutants is a standard for filterable particulate matter. That standard is supposed to be a surrogate standard for the non-mercury metal hazardous air pollutants they emit. There are no standards for the other hazardous standards these plants emit, including organic hazardous air pollutants (such as benzene, formaldehyde and dioxins), mercury, or hydrochloric acid.

13. The area source boilers rule does not require these plants to monitor or report their emissions. Therefore, people who live or work near these plants and are affected by their emissions cannot find out how much toxic pollution they are being exposed to.

14. The area source boilers rule also exempts area source boilers from having to have Title V permits. Because many industrial boilers operate at area sources, many do not have to go through a public process to obtain a permit for their emissions of hazardous air pollutants. As a result, PFPI and I cannot comment on the adequacy of such permits or use them to determine whether such boilers are in

2

**DEC006**

compliance with all applicable requirements for their emissions of hazardous air pollutants.

15. Many of these plants burn materials that an ordinary person would consider waste, such as construction and demolition debris. For example, a new plant in Plainfield, Connecticut is permitted to burn "wood waste from industries." Another plant in Reading, Pennsylvania purports to burn clean wood, but the Department of Energy has reported that it actually burns significant amounts of paper, plastic, and other foreign debris.

16. If the plants that burn wood waste and other materials that an ordinary person would consider waste were subject to EPA's Clean Air Act emission standards for incinerators, they would have to meet numerical emission standards for mercury, lead, cadmium, dioxins, hydrogen chloride, particulate matter, oxides of nitrogen, sulfur dioxide, and carbon monoxide. They would also have to monitor their emissions and report their emissions and their compliance status. All of this information would be collected in a Title V permit that each plant would have to obtain as a condition for operating.

17. The reason that many of the plants I have reviewed escape any obligation to control, monitor, or report their toxic emissions is EPA's definition of non-hazardous secondary materials, which excludes a wide variety of materials that an ordinary person would consider waste. These materials include scrap tires and tire chips, demolition waste, used oil, and other solid wastes.

18. In addition, EPA's standards for plants that are not considered area sources, but are major sources, are weaker in key ways than the standards for waste-burning incinerators of the same type. Take for example a stoker boiler generating 50 megawatts of electricity by burning biomass. (This is a common scenario.) Regulated as a boiler, it is allowed to emit 10 times as much particulate matter, twice as much carbon monoxide, and 55 times as much hydrogen chloride than it would be if regulated as an incinerator. When regulated as boilers, these plants also do not have to meet the incinerator rule's strict standards for cadmium, lead, dioxins, oxides of nitrogen, and sulfur dioxide.

DATED:    April 25, 2014

*Mary S Booth*
_____
Mary S. Booth

3

## DECLARATION OF MARTHA FISHER BRIGGS

1.    I have been a member of the Sierra Club since 1993. My husband is the Outings Chair for the Maine Chapter of the Club, and I coordinate a book club for the Club. I joined the Club because I really value the outdoors and wilderness and having clean and pristine areas that everyone (including me) can enjoy.

2.    I live in Windham, Maine, about 5 miles from the S.D. Warren/Sappi paper mill in Westbrook. I have lived at this address for approximately 13 1/2 years.

3.    I spend lots of time every day outside near my home. I regularly ride my bike in my neighborhood.  There is a large woods behind our house, which is owned by several neighbors. In the warm months, my husband and I enjoy hiking, and in winter, we cross-country ski there. We also have a big garden where we grow a variety of fruits and vegetables, including asparagus, strawberries, raspberries, blueberries, peas, beans, tomatoes, carrots, and broccoli, and we regularly tend to it.

4.    I am careful about what I eat. I enjoy eating the fruits and vegetables I grow. When I buy fish, I try to buy fish that is sustainable, and I like to buy fish that is caught in the local seas.

5.    From its permitting documents, I am aware that the S.D. Warren/Sappi paper mill has a boiler that can and does incinerate, among other things, wood from construction and demolition debris, waste paper, wood waste, and sludge.

6.    I am aware that air emissions from the mill can harm me and can harm vegetation and harm ecosystems. These ecosystems include the areas where I enjoy hiking, biking, skiing, and growing some of my food.

7.    I am concerned about the impact of air pollution, including from the mill, on my health. I spend a lot of time outdoors, and when I am outdoors, I breathe the air. I do not want to breathe in air pollution. Also, I do not want to ingest air pollution that falls to the earth.

8.    I am also concerned about the impact of air pollution, including from the mill, on the environment around me. Being able to spend time outdoors in a natural setting, with a fully functioning ecosystem, is important to me, and air pollution threatens that, which diminishes my enjoyment of my recreational activities.

9.    I am aware that EPA has issued regulations that would exempt the incinerator at the S.D. Warren/Sappi paper mill from having to comply with the Clean Air Act's highly protective emission standards for incinerators despite the fact that it burns waste. As a result, it will not have to meet the highly protective emission standards that the Clean Air Act requires for incinerators' emissions for sulfur dioxide, oxides of nitrogen, carbon monoxide, hydrogen chloride, and particulate matter.

10.    If EPA's definition of solid waste were broader, I understand that the paper mill's incinerator would be subject to tougher limits on emissions of air pollutants. As a result, it would

1

**DEC008**

be able to emit less of them into the air that I breathe. I would take less of them into my body, and risks to my health would be reduced. Further, my enjoyment of my everyday activities would be enhanced because I would have fewer concerns about the impacts of the mill's pollution on the outdoor areas where I hike, bike, ski, and garden.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2014.


_Martha Fisher Briggs_
Martha Fisher Briggs

2

**DEC009**

## DECLARATION OF MAXINE CENTALA

1. I am a member of the Sierra Club, which I joined in December, 2003.

2. I live in Seal Rock, OR, approximately 10 miles southwest of the town of Toledo, OR, and the Georgia-Pacific kraft unbleached pulp mill located there.

3. I moved here about 13 years ago from Seattle, intending to enjoy the Oregon Coast in my retirement and grow a large garden that would include organic vegetables, fruits and berries for my own consumption on the nearly 3 acres of land I purchased with my home.

4. After moving here and spending much time the first summer preparing several large garden beds, I realized that during nice days in spring and summer, my house and garden were often in the plume of pollution from the pulp mill in Toledo, and that the emissions affected my health.

5. I usually experience headache, fatigue, difficulty concentrating, chest congestion and a raspy voice when mill emissions are in the air. At these times I usually notice the rotten egg or rotten cabbage smell of the mill.

6. Other local residents, including one of my neighbors, have reported health effects that they also attribute to the pulp mill pollution. I am acquainted with two people who moved farther away from the mill in order to avoid exposure to the emissions.

7. I gave up my plans for growing my own vegetables and fruit because of the health effects I continue to experience from the mill emissions. I was also concerned that the pollutants from the mill are deposited on the soil and might be taken up by food plants.

8. On the days when the mill emissions are strong I refrain from drying my laundry because the odor from the mill lingers in the fabric.

9. The typical air flow pattern is this: during sunny weather the wind blows hard from the north during the day, and at night it is calm. With no wind at night, the cool air flows downhill from the land following the river valleys toward the ocean and accumulates along the coastline. In the morning when the north wind begins to rise, the polluted air mass (which flows from the Toledo pulp mill down the Yaquina River to the coast during the night) moves southward toward Seal Rock in the morning on the north wind. Sometimes the polluted air mass reaches here just after dark and hangs in all night. The health effects from the pollution are especially bad then, and also during foggy weather.

10. I spend some time outdoors at all seasons, walking, beachcombing and birdwatching. I also spend up to a few hours a week doing yard maintenance during the growing season. I generally stay indoors and avoid these activities when the mill emissions are present. They enter the house anyway and I experience symptoms, although less than I would outdoors.

11. The Georgia-Pacific Toledo pulp mill contributed over 10 million pounds of pollutants to our air in 2011, according to the EPA. Some emissions from the mill are sulfur dioxide,

**DEC010**

particulates, nitrogen oxides, volatile organic compounds (VOCs), and carbon monoxide. The mill also emits lead, mercury, polycyclic aromatic hydrocarbons, and hydrogen chloride.

12. From the mill's Title V permit, I am aware that the mill's incinerators burn various wastes, including wood chips, tire-derived fuel, old corrugated cardboard rejects, rejects from other wastepapers, the rejected wood pulps and fibers and other wastewater treatment plant sludges from the mill's repulping operations, used oil, and wood waste. I am aware from conversations with the Oregon Department of Environmental Quality that the residues from cardboard recycling that get burned include many tons of plastic per day.

13. The mill also has boilers that burn only fossil fuel.

14. Lincoln County, Oregon, where I live far from large cities, has some of the highest cancer rates of all the counties in Oregon, according to the Oregon Cancer Registry. No one has given a satisfactory explanation for this.

15. Georgia-Pacific Toledo is by far the largest industry and the largest polluter in the county.

16. I am exposed to emissions from the Georgia Pacific Toledo mill by breathing air, by eating locally grown produce, and by dermal contact with items in my house and on my property on which emissions from the mill have been deposited. These exposures threaten my health.

17. Because of emissions from the Georgia Pacific Toledo mill, I have had to alter my lifestyle and refrain from recreational activities that I would otherwise engage in. For example, I refrain from gardening and I stay indoors when mill emissions are present.

18. I am aware that EPA has issued regulations that would exempt the incinerator at the Georgia Pacific Toledo mill from having to comply with the Clean Air Act's highly protective emission standards for incinerators despite the fact that it burns wastes. As a result, it will not have to meet the highly protective emission standards that the Clean Air Act requires for incinerators' emissions for sulfur dioxide, oxides of nitrogen, and carbon monoxide.

19. I am also aware that EPA has issued regulations that apply to the hazardous air pollutants the mill's boilers emit and that these regulations are less protective than the Clean Air Act requires.

20. For the reasons given above, EPA's regulations prolong and increase my exposure to pollution and the resulting threat to my health. In addition, these regulations prolong and increase the harm to my aesthetic and recreational interests.

21. If EPA were compelled to revise its regulations to require combustors that burn wastes be subject to the standards that apply to incinerators, pollution from the Georgia Pacific Toledo mill would be reduced, and the resulting harm to my health and recreational interests would be reduced as well.

DEC011

22. Similarly, if EPA were compelled to revise its regulations to provide the protective emission standards that the Clean Air Act requires for industrial boilers and process heaters, pollution from the Georgia Pacific Toledo mill would be reduced, and the resulting harm to my health and recreational interests would also be reduced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of April, 2014.

Maxine Centala

DEC012

DECLARATION OF WILLIAM FONTENOT

1.     I am 71 years old. I currently reside in Baton Rouge, LA 70806. I have lived at the same home here since June 1975, and have lived in Louisiana nearly my whole life.

2.     I am a Sierra Club member and I have been actively involved with the Club since the early 1970s. From 1973 to 1974 I served as the Chairman of the New Orleans Group of Sierra Club. In 1974, I was Chairman of Sierra Club's Delta Chapter. I am currently the Conservation Chair of the Delta Chapter and have served in that position since 2011. As of February 2014, I was elected to the Executive Committee of the Delta Chapter. I also helped found the Louisiana Environmental Action Network and have been a member of it since its founding in the 1980s. I have also served in leadership positions at many other environmental organizations, including the Louisiana Environmental Action Network, the Mississippi River Basin Alliance, Clean Water Fund, Clean Water Action, and Friends of Atchafalaya. Over the last 40 years, I have advocated on behalf of poor and minority communities and individuals, as well as industrial facility workers in and outside of Louisiana to demand protections from harmful pollution.

3.     I am retired, which allows me to devote the majority of my time to volunteering for Sierra Club and other environmental groups. I also conduct Toxic Tours at least a dozen times a year of pollution-ridden communities, inside and outside of Baton Rouge, including the area known as "Cancer Alley," to help individuals understand where pollution comes from, its impacts, and how to address environmental problems and injustice through advocacy.

4.     I am familiar with EPA's definition of non-hazardous secondary materials that are solid wastes when burned, which I believe provides yet another dangerous excuse for industrial facilities to evade compliance with human health and environmental protections Congress put in place. I understand that EPA has allowed industrial facilities to incinerate certain non-hazardous wastes without having to meeting the stringent standards the Clean Air Act requires for emissions of pollutants like sulfur dioxide, oxides of nitrogen, and carbon monoxide. If the EPA's definition were broader, facilities that chose to burn the exempted materials would have to comply with EPA's Clean Air Act rules for incinerators, which establishes more protective requirements. I am very familiar with EPA's use of "linguistic detoxification" to call wastes something different in order to give Industry a free pass from such regulation necessary to protect human health and the environment.

5.     I am aware that the Exxon Chemical Baton Rouge Plastics Plant (BRPP), which is located approximately 8 miles from my home, has boilers that are allowed to burn and historically have burned waste oil, according to its Title V permit application. I also live within 10 miles of the ExxonMobil Refining and Supply, Formosa Plastics Corporation, and Honeywell International plants, which also have boilers.

6.     I am also familiar with the Georgia-Pacific Port Hudson paper mill, in Zachary, LA, about 15 miles from my home. I can occasionally smell hydrogen sulfide—rotten eggs—from the mill, when the wind blows from the north. I regularly go there on Toxics Tours and was last there at the beginning of April. I am aware from the mill's Title V permit that it has a boiler that burns waste wood and paper sludge.

1

7.     I am further aware that EPA has issued regulations that would exempt the incinerators at the ExxonMobil Chemical Baton Rouge Plastics Plant and the Georgia-Pacific Port Hudson paper mill, from having to comply with the Clean Air Act's highly protective emission standards for incinerators. As a result, none of these incinerators will have to meet the highly protective emission standards that the Clean Air Act requires for incinerators' emissions of sulfur dioxide and oxides of nitrogen.

8.     In addition, I am aware that EPA has issued regulations that allow plants to seek "non-waste" determinations for materials they burn that would otherwise be considered wastes.

9.     I am concerned that I am exposed to emissions from BRPP and the paper mill, and other nearby facilities, every day because I live close to them. There are many industrial facilities located near BRPP, including the Exxon oil refinery and the Exxon chemical plant, and I have smelled the pollution they spew into the air. Emissions from BRPP in particular have been of concern for me ever since 1997 when I read about an incident in which a plane from a major airline flew through a massive cloud of chemical pollution released from BRPP prompting serious discussions about chemical accidents and disasters. This incident helped me understand that air pollution can have profound impacts.

10.    Knowing that EPA's rule allows BRPP and the paper mill to avoid having to meet standards for incinerators diminishes my ability to enjoy being outside in my neighborhood and engaging in every day activities. Every day when I leave my home to walk my dog, I worry about harmful air pollution from the many industrial facilities in Baton Rouge, as well as the risk that a major accident like the 1989 Christmas Eve explosion at Exxon's Baton Rouge oil refinery will occur at any one of them and will harm me and the people in the community. Sometimes I can smell a rotten egg smell from the mill's operations. BRPP and the paper mill's exemption from control makes this worry worse. I believe that Baton Rouge would be a safer, more enjoyable place for me and my wife, and everyone in the community if BRPP and the paper mill were not allowed to burn wastes without adhering to otherwise applicable, protective Clean Air Act standards.

11.    I am also concerned that EPA's rule allows the plants near me to obtain non-waste determinations for materials they burn, which opens the door to them calling still more materials non-waste and releasing more pollutants that affect me.

12.    If EPA's definition of non-hazardous solid waste were broader, I understand that units at BRPP and the paper mill would be regulated as incinerators. This will lessen my concerns about harmful air pollution and the associated impacts that may have on me, my wife, and the people of Baton Rouge. If EPA's non-waste determination processes were more protective, my concerns about additional wastes being burned would also be allayed.

2

**DEC014**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April **21**, 2014

William A. Fontenot

3

**DEC015**

## DECLARATION OF ROBERT J. PALZER

1. I am a member of the Sierra Club, and have been for most of the last 54 years.

2. My wife and I live in Ashland, Oregon. We live within 20 miles of several plywood and composite wood products manufacturing facilities, including SierraPine Limited and Boise Building Solutions Manufacturing in Medford.

3. My wife and I moved here in 1986 because we love to hike, bike, fish, ski, canoe and kayak. We spend significant time outdoors in and around our home in Ashland and elsewhere in the Rogue Valley. When we are outside, we breathe the ambient air.

4. My wife and I raise vegetables in our garden and eat the vegetables that we grow. When we work in our garden, we come into direct contact with the soil there.

5. I enjoy fishing recreationally in our local waters. Because the Oregon Department of Human Services has advised all persons to avoid or limit consumption of some species of fish caught in local waters because they have high levels of mercury, PCBS, dioxins, or pesticides, I am not able to eat as many locally-caught fish as I otherwise would like. Oregon Department of Human Services, Oregon Fish Advisories (2009). The contamination of our local waterways from industrial pollution has negatively impacted my ability to enjoy fishing and other similar recreational activities.

6. My wife and I make regular trips near the SierraPine and Boise Solutions facilities on a weekly basis to shop, attend meetings and other events, visit friends, or run errands.

7. I am Senior Technical Advisor for the Sierra Club Clean Air Team, am currently the Vice Chair of the Rogue Group of the Club's Oregon Chapter, and have served as the Air Quality Coordinator for both the Rogue Group and the Oregon Chapter of the Sierra Club for the past 24 years.

8. Because air toxics in the Medford region are similar to those in Portland, I served as an ex-offio member of the Portland Air Toxics Solutions Advisory Committee, made up of diverse stakeholders, to consider a technical study and develop a framework for an air toxics reduction plan. Together with DEQ we developed a ground-breaking analysis and understanding of air toxics problems

**DEC016**

and potential solutions in the Portland region. The committee met August 2009 to October 2011.

9. I co-founded the Coalition to Improve Air Quality in 1988 and the Rogue Valley Citizens for Clean Air in 2004 and have been a spokesperson for these groups.

10. For more than twenty years I have worked on behalf of the Sierra Club and other civic and conservation organizations to improve efforts by EPA and Oregon to control and reduce emissions of air pollutants from industrial sources in the Rogue Valley. For example, I have represented the Sierra Club as a member of the EPA FACA on Integrated Combustion Control Regulations, the EPA FACA on Ozone, PM, and Regional Haze Implementation Programs, the EPA FACA on Wildland Fires Issues Group, EPA's Title V Task Force, the Western Regional Air Partnership and numerous Oregon Departmental Quality advisory committees. I have reviewed, attended hearings on, and commented on the Title V permits for the SierraPine and Boise Building Solutions Manufacturing facilities, among others.

11. I am aware of air toxics monitoring EPA and the Oregon Department of Environmental Quality have done in the Medford area. When last done in 2008-2010, it showed numerous hazardous air pollutants you get from plants like SierraPine and Boise's at levels up to tenfold above recommended exposure thresholds.

12. My family and I are deeply concerned about the damage that is being done and will be done by emissions from the plywood and composite wood products facilities near us and other plywood and composite wood products facilities to our area's parks, to the Rogue River, Ashland and Bear Creeks and other rivers and streams that flow through them and to the plant and animal species that inhabit these water bodies and lands. The pollution deposited on our property and surrounding area diminishes our enjoyment of recreational activities there.

13. My wife and I drink water from Reeder Reservoir in Ashland that is supplemented by water from other higher elevation reservoirs that is transported by open canals of the Talent Irrigation District (TID). Air pollutants deposited in these water bodies adversely affect my wife and I both by drinking the water and also by consuming locally grown fruits and vegetables irrigated by water from the TID in this very arid area during much of the growing season.

**DEC017**

14. Based on my having reviewed their Title V permitting documents, I am aware that the SierraPine facility has a incinerator that burns sanderdust and that the Boise Building Solutions Manufacturing facility has a incinerator that burns hogged fuels consisting of wood residues, oil products, wood debris, glue waste, and wood from other sources.

15. I am aware that incinerators like these emit, among other things, particulate matter, carbon monoxide, hydrogen chloride, oxides of nitrogen, and sulfur dioxide. And I am aware that these pollutants pose serious health risks, especially to older people like me, and harm the environment.

16. My family and I are exposed to the pollutants emitted by the Boise Building Solutions Manufacturing and SierraPine facilities by breathing air, drinking water, eating food and through dermal contact with water and soil. Therefore, emissions from these plants threaten our health.

17. I am aware that EPA has issued regulations that would exempt the incinerators at the SierraPine and Boise Building Solutions Manufacturing facilities from having to comply with the Clean Air Act's highly protective emission standards for incinerators despite the fact that they burn waste. As a result, it will not have to meet the highly protective emission standards that the Clean Air Act requires for incinerators' emissions for sulfur dioxide, oxides of nitrogen, carbon monoxide, hydrogen chloride, and particulate matter.

18. For the reasons given above, EPA's regulations prolong and increase my exposure to pollution and the resulting threat to my health. In addition, these regulations prolong and increase the harm to my aesthetic and recreational interests.

19. If EPA were compelled to revise its regulations to require combustors that burn wastes be subject to the standards that apply to incinerators, pollution from the SierraPine and Boise Building Solutions Manufacturing facilities would be reduced, and the resulting harm to my health and recreational interests would be reduced as well.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 18th day of April, 2014.

DEC018

Robert J. Palzer, PhD

DEC019

## DECLARATION OF SUE POPE

1.     I am one of the founders of Downwinders At Risk and am still a member, as I have been since it was organized in 1993 and 1994.

2.     I live in Midlothian, Texas. I am 73 years old.

3.     I live on land that has been in my family for about 100 years. It is about 70 acres. On it, I have about 40 cattle (the number varies) and 2 horses. I know I should move, but all my memories are here. This land was my grandfather's.

4.     My property is about 7.5 miles from the TXI cement plant in Midlothian. I am downwind of it. It is also about 4 miles from the Ash Grove plant and under a mile from the Holcim cement plant property. All the plants are right near schools, too.

5.     From my work with Downwinders, I am aware that the TXI plant burns both whole and chipped tires. I am aware that EPA has made regulations that say these tires are not solid wastes, so the TXI plant is not an incinerator. If the TXI plant were an incinerator, it would be subject to stricter standards for pollutants like particulate matter, dioxins, sulfur dioxide, and oxides of nitrogen than it is now. I am also aware that the TXI plant would be subject directly to standards for its emissions of carbon monoxide and of metals like cadmium and lead that it now isn't subject to.

6.     My family and I have long had to deal with the emissions from the plants in the area. In the 1990s, our cattle and horses started suffering birth deformities, and in 1997, I had to quit breeding horses. In the mid 1990s, tests showed that my husband had high levels of cadmium. He developed prostate cancer and after four bouts with it, he died in January 2011. Everyone one around got sick when the kilns started.

**DEC020**

7.     I have serious heart and lung problems. I am on oxygen continually and regularly go to a lung doctor. I have only about 1/3rd of my lung function remaining. I have asthma; but because of my heart problems, I cannot regularly take my asthma medication, which raises my blood pressure.

8.     I am aware from EPA documents that particulate matter is especially dangerous for older adults, like me, and those with heart and/or lung conditions. I am very concerned about the effects of particulate matter on my health. I am also aware from EPA documents that sulfur dioxide and oxides of nitrogen are dangerous on their own, particularly for people with breathing problems, and that they can also form particulate matter in the air. I am also aware that oxides of nitrogen can form smog, which is dangerous for older adults and those with lung conditions, and that Midlothian is part of an area that has unhealthily high ozone levels.

9.     When I sense odors which are not natural or normal, and the wind direction is towards the farm, I must go inside to try and prevent attacks. Just recently, I was outside planting flowers when a concerned friend called to tell me that she smelled an abnormal odor coming from the closest plant and suggested I go indoors. We can see the stacks of one of the plants from our property and we are downwind of all particulate sources in Midlothian the greater part of the time.

10.     I am also aware from my work on fighting against the pollution that affects my community that particulate matter and other pollutants that cement plants emit, like mercury and heavy metals, harm the environment. I live in the country. I see what's so important about the environment. What the Lord has given us is too precious to destroy. I just feel real strongly about it. When the environment around me is harmed, it does damage to my property and it affects my enjoyment of my everyday life.

2

**DEC021**

11.     I had two little girls visit me with their aunt when the air was bad—I could feel it. They both had asthma attacks while they were here. One had to go to the hospital later that night. They live in the area. Two other children moved to the farm 8 years ago. They have developed learning disabilities that I am concerned are related to the cement plants in the area. I am also concerned that their continual respiratory problems are related to the plants' emissions.

12.     If EPA's definition of solid waste were broader, I understand that the TXI plant would be subject to tougher limits on emissions of air pollutants. It would be able to emit less of them into the air that I breathe. I would take less of them into my body, and risks to my health would be reduced. My concerns about damage to my property and my livestock would also be lessened, and I would be able to spend more time outside. My enjoyment of my everyday activities would be improved, too.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 2/8 day of April, 2014.


_____

Sue Pope

3

**DEC022**

**DECLARATION OF JANE WILLIAMS**

1.      I am a member of the Sierra Club, and have been since 1997.

2.      I am a member of the Sierra Club's Clean Air Team, which is responsible for air toxics litigation, air toxics policy, and providing direct support to communities facing air toxics problems.

3.      I also am the executive director of California Communities Against Toxics, an environmental justice network in California and an active member of Desert Citizens Against Pollution, a nonprofit environmental health group that works on desert pollution issues.

4.      Since 1992, I have worked on behalf of Desert Citizens Against Pollution to improve efforts by EPA to control and reduce emissions of air pollutants from cement kilns in California. For example, I commented on EPA's proposed regulations on hazardous waste combustors, which included cement kilns that burn hazardous waste. I also worked with the EPA on developing air permits for the Calaveras (now the Lehigh Southwest Cement Company) Cement Kiln in Tehachapi, California. I was party to a suit against the Kern County Air Pollution Control District regarding a cement kiln (now the CalPortland kiln) in Mojave that wanted to burn tires. Desert Citizens Against Pollution also threatened to sue the Mojave Air District for its actions at the Oro Grande kiln in San Bernardino because the local air district was going to allow that kiln to burn tires and industrial waste without an environmental review. In the 1990s, Desert Citizens Against Pollution sued the National Cement Company, which operates a kiln in Gorman/Lebec, under RCRA. Desert Citizens Against Pollution was also involved in bringing about EPA's intervention when the kiln in Tehachapi made illegal permit modifications.

**DEC023**

5.      Because I am aware that cement kilns emit vast quantities of air pollutants and that waste-burning at kilns can yield even more toxic emissions, I have worked on behalf of Desert Citizens Against Pollution for 22 years specifically to ensure that federal regulations contain provisions limiting toxic pollution from cement kilns and waste-burning kilns in particular.

6.      I am aware that EPA's new definition of "solid waste" has the effect of exempting many waste-burning cement kilns, including the kilns near my home, from compliance with regulatory requirements under Section 129 of the Clean Air Act. I am aware that EPA has finalized critically important new standards for commercial and industrial solid waste incinerator ("CISWI") units including waste-burning kilns. These standards require stricter protections against particulate matter, dioxin, sulfur dioxide, and oxides of nitrogen emissions than EPA's cement kiln standards do. *Compare* 78 Fed. Reg. 9112, 9118 tbl.2, 9122-23 tbl.4 (Feb. 7, 2013) (CISWI rule), *with* 40 C.F.R. §63.1343 tbl.1. However, the "solid waste" definition rule renders the new CISWI standards largely inapplicable.

7.      My family and I live on our ranch in Rosamond, CA.

8.      Our ranch in Rosamond is approximately 12 miles from the CalPortland cement kiln in Mojave, 20 miles from the Lehigh cement kiln in Tehachapi, and 25 miles from the National Cement Company cement kiln in Gorman/Lebec. I see the CalPortland kiln whenever I am out riding my horse.

**DEC024**

9.      I am aware from EPA documents (EPA-HQ-OAR-2002-0051-3582) that the

National Cement Company's kiln burns tire-derived fuel (shredded tires and tire fluff) and that

EPA does not consider it as burning waste. I am also aware from its most recent federal Title V

permit that the CalPortland plant is allowed to burn whole tires.

yosemite.epa.gov/R9/air/EPSS.NSF/6924c72e5ea10d5e882561b100685e04/8d13f263d5ac98f18

82569ae00789f16!OpenDocument; *see also*

www.arb.ca.gov/ei/tire/2013_tire_burning_report.pdf at 5 tbl.1 (plant is allowed to burn tires).

10.     In addition, I am aware that Lehigh has applied for a conditional use permit that

would allow it to burn "alternative waste-derived fuels, including: tire-derived fuels (TDF),

refuse-derived fuels (RDF) and biomass." *See*

www.co.kern.ca.us/planning/pdfs/eirs/lehigh/lehigh_deir_vol1.pdf at 1-1. The biomass would

include agricultural waste. *Id.* 3-20.

11.     I am aware from reports on cement plants' test burns of tires that tire burning can

increase plants' emissions of toxic air pollution like cadmium, lead, hexavalent chromium, and

dioxins. In particular, I am aware that the Kern County Air Pollution Control District's report on

the test tire burns for the National Cement Company plant showed that the plant's emissions of

cadmium and dioxins increased when it was burning tires.

12.     I regularly see kiln upsets at the Tehachapi kiln. I drive by it a couple times a

month, and roughly every three times I drive by I see visible emissions. During normal

operations, emissions are not supposed to be visible. During upsets, I see a giant cloud of light

grey smoke. There is a nasty smell, like something is burning; it is acrid. My throat gets really

dry. If I am too close, my eyes start to water. If I drive by the kiln and see that there is an upset, I

do not engage in activities outdoors near my home.

3

**DEC025**

13.    I observe visible emissions at the Tehachapi kiln more often than at the other kilns. I occasionally pass by the National Cement Company kiln in Gorman, but have not seen visible emissions there.

14.    Every day I can, I spend a significant amount of time outside. I walk outside for at least thirty minutes every day during the week. My family and I spend significant time outdoors in and around my home/ranch in Rosamond, CA, where we ride horses, ride bikes, swim, hike, and recreate outdoors. When I am outside, I breathe the air. When my family is outside, they breathe the air.

15.    One of my children, who is 13 years old, and my nephew who is 15 years old are often outdoors with me breathing outdoor air. My son and nephew are more susceptible to air pollution because they breathe more air per pound of body weight than adults, and their bodies are still developing. As a result, they have a greater sensitivity and are more at risk to air pollution than the population in general.

16.    By breathing, my family and I are exposed to air pollutants, including fine particulate matter, oxides of nitrogen, and hazardous air pollutants, emitted by cement kilns operating in the Gorman/Mojave/Rosamond area. I have a heart murmur and have been told to avoid strenuous activities on bad air days.

17.    I am aware that hazardous air pollutants can be transported great distances by air currents. Therefore, by breathing, my family and I also are exposed to hazardous air pollutants emitted by sources that operate outside the immediate area of my residence. These other sources also contribute to my family's cumulative exposure to persistent, bioaccumulative toxins.

**DEC026**

18.    I am aware that hazardous air pollutants such as dioxins, mercury, and polychlorinated biphenyls (PCBs) are deposited on water and soil, where they persist for long periods of time and bioaccumulate in wildlife and livestock. By eating fish, meat, and dairy products, my family and I are exposed to hazardous air pollutants emitted by sources in the Gorman/Mojave/Rosamond area and also to hazardous air pollutants emitted elsewhere and transported to areas where the food we eat is raised or caught. I am a vegetarian due to health concerns about, among other things, bioaccumulation of pollutants. If it were safe to eat local fish, I would like to eat them. My son, nephew, and I go fishing about half a dozen times a year at Bryce Lake, but we have to throw the fish back because there is a fish consumption warning there due to mercury. The mercury contamination in the lake diminishes my enjoyment of fishing. And, if it were safe to eat the fish, we would go more often (and eat them, too).

19.    I am aware that EPA has designated where I live as nonattainment for the national ambient air quality standards for ozone, and I am aware that oxides of nitrogen can turn into ozone in the air.

20.    My family and I are deeply concerned about the damage that is being done and will be done by emissions from the three cement plants near us and other cement plants to our area's parks and our ranch land, to the rivers and streams that flow through them, and to the plant and animal species that inhabit these water bodies and lands. In particular, we are concerned that persistent and bioaccumulative pollutants, such as mercury, cadmium, and dioxins, contaminate the air, water, wildlife, and food sources on our property and in the community where we live and recreate. In addition, I am aware that particulate matter that falls to earth can harm vegetation and ecosystems, particularly near sources like cement kilns. The pollution deposited on our land diminishes our enjoyment of recreational activities there.

**DEC027**

21.    Because mercury and other persistent and bioaccumulative pollutants persist in the environment, any of them that are emitted into the air and fall back to the ground stay in the environment without breaking down. Thus, it is difficult if not impossible to take the emitted mercury (and other similar toxins) back out of the environment once they come out of a kiln's smoke stack.

22.    Based on the sources indicated, I am aware of the following:

    a. Portland cement kilns emit, among other things, mercury, dioxins, cadmium, lead, oxides of nitrogen, sulfur dioxide, total hydrocarbons, polycyclic organic matter (POM), hydrochloric acid, and particulate matter. 75 Fed. Reg. 54,970, 54,970 (Sept. 9, 2010); 63 Fed. Reg. 14,182, 14,183 (Mar. 24, 1998).

    b. Exposure to these pollutants can cause adverse health effects including cancer, liver disease, reproductive disorders, immune disorders, respiratory disease, asthma attacks, heart problems, kidney disease, and death. 75 Fed. Reg. at 54,979; 63 Fed. Reg. at 14184-14185.

    c. Emissions from Portland cement kilns are preferentially deposited on land and water bodies located near their source, and are also transported over great distances. EPA, Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("Great Waters Report"), Executive Summary at x-xi.

    d. Some emissions from Portland cement kilns, including mercury, dioxins, cadmium, and lead, persist in soil and water for long periods of time. In addition, they are absorbed by plants and bioaccumulate in fish and animals. Great Waters Report, Executive Summary at ix-x.

**DEC028**

e. Mercury inhalation can affect the central nervous system, kidneys, and heart. CalEPA, OEHHA, *Technical Support Document For the Derivation of Noncancer Reference Exposure Levels* app. D, at Mercury-7 to -8.

f. Particulate matter likely harms vegetation and ecosystems, especially near cement kilns. 78 Fed. Reg. 3086, 3203 (Jan. 15, 2013).

g. Ozone harms the lungs and can cause various breathing problems, and also has harmful effects on vegetation and ecosystems. 72 Fed. Reg. 37,818, 37,827, 37,827-29, 37,832, 37,883 (July 11, 2007).

23.    My family and I, and our property, are exposed to pollutants emitted by the Tehachapi, Mojave, and Gorman plants, including mercury, cadmium, dioxins, total hydrocarbons, hydrochloric acid, oxides of nitrogen, sulfur dioxide, and particulate matter. We are also exposed to ozone formed by some of these pollutants in the atmosphere. These emissions enter our bodies when we breathe. We are also exposed to these substances by drinking water, eating food, and touching water and soil. Pollutants from these plants threaten our health, cause us concern about their impact on our health and property, and prevent me from engaging in activities I otherwise would engage in, like jogging. They also cause irreparable damage to the natural environment around me, diminishing my enjoyment of it.

24.    If EPA's definition of "solid waste" were broader and didn't exempt materials like tires and tire-derived fuel, the National Cement Company plant near me would be an incinerator, the Lehigh plant near me would be unable to burn the new wastes it seeks to burn without being an

**DEC029**

incinerator, and the CalPortland plant near me would be unable to burn tires without being an incinerator. For many pollutants they emit, they would thus be subject to stronger standards than they otherwise would be, providing additional protection to me against its emissions of pollutants like dioxins, sulfur dioxide, oxides of nitrogen (and thus ozone), and particulate matter. My concerns for my health would be alleviated and my enjoyment of my activities and my surroundings would be enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of April, 2014.

Jane Williams

**DEC030**